MICHAEL S. STEIN, ESQ.
SEAN MACK, ESQ.
**PASHMAN STEIN**
A Professional Corporation
21 Main Street, Suite 100
Hackensack, New Jersey 07601
(201) 488-8200

*Attorneys for Plaintiff and Third Party Defendant*
 FANCASTER, INC. and CRAIG KRUEGER

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FANCASTER, INC., <br><br>       Plaintiff, <br><br>   vs. <br><br> COMCAST CORPORATION, COMCAST INTERACTIVE MEDIA, LLC and COMCAST MANAGEMENT, LLC, <br><br>       Defendants/Counterclaimants <br>       Third Party Plaintiffs <br><br>   vs. <br><br> FANCASTER, INC. sometimes d/b/a "TARGET WIRELESS", <br><br>       Counterclaim-Defendant, <br><br>   and <br><br> CRAIG KRUEGER, <br><br>       Third-Party Defendant. | Case No: 08 Civ. 02922 (GEB-ES) <br><br><br><br><br><br><br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT AND FOR A RELATED CASE MANAGEMENT ORDER** |

## TABLE OF CONTENTS

**I. FACTUAL BACKGROUND** ……………………………………………………  1

**II. ARGUMENT** ………………………………………………………………  8

    **A. Legal Standard**  ………………………………………………………...  9

    **B. The Court Should Permit Fancaster to File a Supplemental Complaint**  …..  10

    **C. Fancaster Should Be Permitted To Take Discovery On Comcast's
       New Infringing Activities, Including Damages-Related Discovery, and
       to Serve Expert Reports Reflecting the Newly Discovered Information**  …..  18

    **D. The Court Should Enter A Scheduling Order That Provides Sufficient
       Time for Fancaster To Obtain Necessary and Appropriate Discovery
       Directed to Comcast's New Infringing Activities and Fancaster's Legal
       Remedies** ………………………………………………………………  19

**III. CONCLUSION**  …………………………………………………………  20

## TABLE OF AUTHORITIES

**Cases:**

*Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332 (D.N.J. 2001) ………………..16

*Hassoun v. Cimmino,* 126 F.Supp.2d 353, 360-61 (D.N.J. 2000) …………………………9, 12

*Johnson v. Knorr*, 130 F. App'x 552 (3d Cir. 2005) ………………………………………… 11

*Rosedale Manor Assocs., LLP v. Borough of Madison, N.J.,*
    2006 WL 3751353, (D.N.J. Dec 19, 2006)(Brown, C.J.) ……………………………… 9

*Tormasi v. Hayman*, 2010 WL 1878961, (D.N.J. May 10, 2010) …………………………  9, 12

**Other Authorities and Rules:**

Fed. R. Civ. P. 15(d) ………………………………………………………………...  9

6A C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* § 1506 (2d ed.). ………………………  9, 10

Pursuant to Fed. R. Civ. P. 15 and Local Rule 7.1, Plaintiff Fancaster, Inc. ("Fancaster") submits this memorandum of law in support of its motion for leave to file a supplemental Complaint in this matter to allege new infringing activities that the Defendants (collectively, "Comcast") commenced in late 2009 or early 2010, after the close of discovery.  Fancaster further seeks entry of a case management order that permits it to take limited discovery into these recent events and to present any resulting expert reports.  Pursuant to the Court's guidance at the May 12, 2010 status conference, Fancaster *does not* seek to re-open discovery of events that occurred prior to the close of discovery.

## I.    FACTUAL BACKGROUND

### A.  Comcast's New Infringing Activities Beginning in Late 2009 or Early 2010.

#### 1.  Comcast Announces On Demand Full TV Episode and Feature-Length Movies on Fancast.com.

Fancaster filed its complaint in June 2008, based on Comcast's prior infringing activities. On March 24, 2009, the Court set a discovery schedule that called for fact discovery to close by August 19, 2009. (Docket No. 36.)  After Comcast failed to respond to Fancaster's discovery, the Court issued a new scheduling order that extended the deadline to October 16, 2009.   Expert reports were due on November 18, rebuttal reports on December 23, 2009, and expert discovery was to close on January 27, 2010.  (Docket No. 45.)

On December 15, 2009, two months after the close of fact discovery and shortly before the deadline for rebuttal expert reports, Comcast announced a major expansion of the services it had been offering under the infringing "Fancast" name and also announced the renaming of "Fancast" to "Fancast XFINITY TV."  The new Fancast XFINITY TV incorporated Comcast's On Demand Online service and made available to Comcast customers thousands of hours of on-demand content.  In the press release announcing the change, Comcast explained that:

1

> Both Comcast customers and non-Comcast customers across the nation currently have access to over 12,000 hours of great online content through Fancast.com – the company's online TV site and a top TV destination on the web – for free.  Now, as a benefit of their cable subscription, Comcast customers will enjoy even more access to thousands of titles from the cable channels in their subscription package at no additional cost through Fancast XFINITY TV. … Beginning today, any Comcast customer with a digital cable and Internet subscription can visit www.comcast.net or www.fancast.com, sign-in with their Comcast email user name and password and watch their favorite subscription content at no charge.

**(Matorin Decl.  Exh. 1 and 2.)**

Comcast's website explains the difference between its prior offerings under the "Fancast" name and the new services offered under "Fancast XFINITY TV":

> **What is the difference between Fancast and Fancast XFINITY TV?**
>
> Fancast is available to anyone – whether you are a Comcast customer or not, you can watch movies, television programs, and special features online from anywhere.
>
> **Fancast XFINITY TV is an additional service available to Comcast customers who subscribe to both Comcast Digital Cable *and* High-Speed Internet service, which provides access to On Demand content online.**

**(Matorin Decl. Exh. 3.)** (italics in original; boldface added).  The www.fancast.com website remains the primary outlet for Comcast's Fancast XFINITY TV offerings, although it now bears a new logo combining the infringing name with the new Xfinity TV name:



The new Fancast.com website offers full-length network television programs such as Medium, CSI: New York, The Tonight Show With Jay Leno, and various other programs broadcast on the ABC, CBS, and NBC television networks.  **(Matorin Decl. Exh. 4.)**  It also offers full-length TV programs from HBO, Animal Planet, Discovery Channel, Encore,

CineMax, and various other premium cable TV channels.  In addition to these full-length

television shows, the Fancast.com website provides on demand access to feature films from the

premium subscription services.  (**Matorin Decl. Exh. 5.**) This premium content, designated with

an orange "key" graphic, is available only to Comcast cable TV customers who subscribe to the

relevant premium channels.

In addition to the foregoing, Comcast has added additional infringing Internet domains to

its portfolio since Fancaster filed its complaint.  Although it is difficult to determine all of the

domains that Comcast has recently registered, it has registered at least the following infringing

domains:  www.fancastxfinity.com, www.fancastxfinity.tv, www.fancastxfinity.net,

www.fancastxfinity.org,  www.fancastxfinitytv.com, www.xfinityfancast.com,

www.xfinityfancast.tv, www.xfinityfancast.net, www.xfinityfancast.org.

## 2. Comcast's New Fancast XFINITY TV Services Are Creating Significant New Revenue Opportunities for Comcast.

Since it announced the extensive new premium content available through Fancast

XFINITY TV, Comcast has actively promoted it as a hook to increase its revenues from its cable

TV, high-speed Internet, and premium channel subscriptions.  In fact, some commentators have

described Fancast XFINITY TV as an effort to lock existing customers into their cable TV and

Internet subscriptions with Comcast to counter Comcast's loss of subscribers to other

entertainment outlets.  (**Matorin Decl. Exh. 6.**) On May 11, 2010, Comcast's CEO, Brian

Roberts, acknowledged his concerns about the trend of cable customers dropping their cable TV

subscriptions in favor of Internet video entertainment but stated that Comcast was focused on

developing Fancast XFINITY TV to allow Comcast to reach viewers on different types of

devices.  (**Matorin Decl. Exh. 7.**)

On the Fancast.com website, Comcast notes that premium TV offerings such as HBO, A&E, TNT, and Cinemax may be watched on Fancast Xfinity TV, "based on your Comcast subscription" and advises visitors that they must subscribe to Comcast high-speed Internet services and optionally to premium cable TV services.  **(Matorin Decl. Exh. 8.)**  Visitors to Fancast.com are greeted with a pop-up advisory that Comcast customers have access to more than a thousand additional TV shows and movies if they subscribe to Comcast's high-speed Internet and digital cable TV services.  **(Matorin Decl. Exh. 9.)**  Similarly, Comcast encourages its customers to add additional premium cable TV services to access the full panoply of premium content on Fancast XFINITY TV:

> Upgrade and Watch more
>
> You can upgrade your Comcast Cable subscription to access these additional premium networks:

**(Matorin Decl. Exh. 10.)** Visitors to the website who click on one of the premium television or movie offerings available only to Comcast premium channel subscribers are greeted with a pop-up that invites them to subscribe to the premium channel so that they can get "anytime, anywhere access" to that video.  **(Matorin Decl. Exh. 11.)**

In addition to using Fancast XFINITY TV as an incentive to encourage non-Comcast customers to sign up for Comcast high-speed Internet and cable TV services and to encourage existing Comcast cable TV customers to upgrade their services to include high-speed Internet and premium cable TV subscriptions, Comcast has also made clear that it expects to receive significant increased revenue through advertising included within the new content that it is now making available through Fancast XFINITY TV.  On December 21, 2009, Comcast Interactive Media's  President, Amy Banse, observed that consumers were watching video on the Fancast XFINITY TV service "two to three times longer than users of the regular Fancast site," and that

4

this online viewing habit was "additive to both digital video recorder use and regular TV viewing." **(Matorin Decl. Exh. 12.)** To the extent that the new Fancast XFINITY TV service leads to doubling or trebling the amount of regular cable TV that Comcast cable TV subscribers watch, this undoubtedly enables Comcast to increase the amounts that it charges advertisers on its cable TV channels and the revenues that it receives as a result of that advertising.

Comcast's Senior Vice President of New Media, Matt Strauss, has also commented on the new advertising possibilities Fancast XFINITY TV offers, noting that "some programmers like TNT and TBS are experimenting with the full ad load carried over from broadcast." (*Id.*)  In fact, many, if not all, of the videos available through the new Fancast.com website contain embedded advertisements that viewers may not skip.  (***See, e.g.*, Matorin Decl. Exh. 13.)** Fancaster does not have access to the subscription-only videos but believes that they also contain embedded advertisements.  Moreover, Fancaster understands that the feature-length movies that are available on the new Fancast.com also contain embedded advertisements that viewers must watch in order to see the movie.

In addition to the massive amounts of new free and premium content available for viewing on the new Fancast.com website and the new cross-selling and advertising opportunites, Comcast now offers downloadable full length feature films for purchase or rental.  On May 11, 2010, Comcast announced that Fancast XFINITY TV enabled Comcast customers to access online "nearly 1,500 movies from their cable subscription" and to purchase or rent approximately 5,500 movies through "the Fancast.com store" located at http://store.fancast.com/movies. **(Matorin Decl. Exh. 14.)**  The Fancast.com store gives visitors a choice of purchasing or renting new releases such as Avatar, which may be purchased for $17.99 or rented for $3.99.  **(Matorin Decl. Exh. 15.)**

Comcast continues to make new services available through Fancast.com.  For example, on March 22, 2010, Comcast announced that it had started making available minor league baseball games through the On Demand service available on Fancast.com.  (**Matorin Decl. Exh. 16.**)

Thus, Comcast itself has repeatedly demonstrated that the launch of Fancast XFINITY TV has significantly changed the business model of the prior Fancast service.  Comcast is intentionally using the Fancast XFINITY TV service to directly increase revenues from its cable TV services, high-speed Internet services, and premium cable TV subscription packages as well as through increased advertising opportunities, substantial changes in its subscribers viewing habits, and the online sale and rental of feature films through the Fancast.com online store.  These revenues are obtained by all three of the Comcast defendants and most likely by other Comcast Corporation subsidiaries and affiliates.

   B.  **Comcast Begins a Rebranding Campaign, Including Rebranding Fancast as Fancast XFINITY TV.**

In early February 2010, Comcast announced what has been described as a "massive re-branding campaign" to attach the Xfinity name to all of its services, including an "advertising blitz" consisting of television advertisements during the Winter Olympics, print advertisements, and radio spots, beginning the week of February 15, 2010.  (**Matorin Decl.  Exh. 17.**)  The re-branding process was to begin in eleven markets, including Boston, Philadelphia, Washington, DC, Chicago, and Seattle, and is to be extended to the remainder of Comcast's major markets by the end of 2010.  (**Matorin Decl. Exh. 18.**)

In the course of the campaign to rebrand all of Comcast's services as "Xfinity," Fancaster Comcast has engaged in significant advertising and marketing of the new Fancast XFINITY TV name.  This has taken the form of press releases and public relations campaigns and has had the

desired effect of creating widespread media coverage of the Fancast XFINITY TV name and the new services that it represents.

In addition, Fancaster believes that Comcast has widely advertised the Xfinitytv.com and Xfinity.tv websites as outlets for the television and movie content that it offers through the Fancast.com website.  The Xfinity.com website also advertises and encourages visitors to subscribe to premium cable services such as HBO in order to take advantage of the ability to watch the shows online.  (**Matorin Decl. Exh. 19.**)]  Although the Xfinity.com website itself does not show the Fancast.com name, Internet users have no ability to watch online television at Xfinity.com.  Instead, when a user clicks on any TV-related options within Xfinity.com, the website redirects the user to the appropriate page on the Fancast.com website.

The rebranding campaign has had the effect of blurring the distinction between Fancast, Fancast XFINITY TV, and Xfinity TV, with the result that media reports have on occasion treated the three terms as interchangeable.  For example, on April 20, 2010, an article on the Interactive TV Today website referred to Fancast XFINITY TV as "Comcast Xfinity TV (www.fancast.com)," and it appears that Comcast is using the rebranding initative as a way to transition Internet users from Fancast to Fancast XFINITY TV and eventually to XFINITY TV alone.

## II.  <u>ARGUMENT.</u>

All of the foregoing significant changes were announced after the close of fact discovery and after the Court became aware of the complete breakdown of the attorney-client relationship between Fancaster and its prior counsel.  Fancaster respectfully submits that the interests of justice require that it be permitted to file a supplemental complaint to allege the additional new infringements and that it be permitted to take discovery from Comcast directed to the new

infringing activities in order to obtain the evidence it requires to establish Comcast's

infringement at trial and to support its claims for relief.

### A.  Legal Standard.

The Federal Rules of Civil Procedure provide for supplementation of a complaint to set

out transactions and events that occurred after the initial complaint was filed:

> **(d) Supplemental Pleadings**.  On motion and reasonable notice,
> the court may, on just terms, permit a party to serve a supplemental
> pleading setting out any transaction, occurrence, or event that
> happened after the date of the pleading to be supplemented.  The
> court may permit supplementation even though the original
> pleading is defective in stating a claim or defense.  The court may
> order that the opposing party plead to the supplemental pleading
> within a specified time.

Fed. R. Civ. P. 15(d).

Unlike Rule 15(a)(2) which governs amendment, Rule 15(d) does not include an explicit

mandate that leave be "freely given when justice so requires."  However, as Chief Judge Brown

has observed, courts construe Rule 15(d) to require the same liberal approach:

> leave to file a supplemental complaint should be freely permitted
> in the absence of undue delay, bad faith, dilatory tactics, undue
> prejudice to defendants, or futility, and when the supplemental
> facts are connected to the original pleading.

*Rosedale Manor Assocs., LLP v. Borough of Madison, N.J.*, 2006 WL 3751353, at *3 - *4

(D.N.J. Dec 19, 2006)(Brown, C.J.); *see also Tormasi v. Hayman*, 2010 WL 1878961, at *2

(D.N.J. May 10, 2010); *Hassoun v. Cimmino,* 126 F.Supp.2d 353, 360-61 (D.N.J. 2000).

This approach is consistent with the general policies underlying the Rules of Civil

Procedure, among which is that a party should be given "every opportunity to join in one lawsuit

all grievances against another party regardless of when they arose."  6A C. Wright & A. Miller,

*Fed. Prac. & Proc. Civ.* § 1506 (2d ed.).  A liberal approach to supplemental pleadings promotes

judicial efficiency, avoids multiple litigations and provides a complete adjudication of the

parties' dispute.  *Tormasi*, 2010 WL 1878961 at *2 (quoting *Hassoun*, 126 F. Supp. at 360).

This is because the "usual effect" of denying leave to file a supplemental pleading is to force the

plaintiff to institute another action and move for consolidation in order to litigate all claims at

once, which is "a wasteful and inefficient result."  6A C. Wright & A. Miller § 1506.

### B.  The Court Should Permit Fancaster to File a Supplemental Complaint.

The Court should exercise its discretion to permit Fancaster to file a supplemental

complaint that sets out Comcast's new infringing activities that commenced after the close of

fact discovery.

### i.   There Has Been No Undue Delay, Bad Faith, or Dilatory Tactics By Fancaster.

First, there has been no undue delay by Fancaster in seeking leave to supplement its

complaint, and Fancaster has not demonstrated any bad faith or engaged in dilatory tactics.

Comcast did not even announce the launch of its new Fancast XFINITY TV service until

December 15, 2009, two months after fact discovery had closed, and shortly before the deadline

for rebuttal expert reports.  By the time that Comcast made its announcement, the Court had

already been advised of the complete breakdown of the relationship between Fancaster and its

counsel.  On December 17, 2009, two days after Comcast's announcement, the Court ordered

Fancaster's counsel to file a formal motion to withdraw.  The Court granted the motion to

withdraw on February 8, 2010 and gave Fancaster until March 22, 2010 to obtain new counsel.

During this period in which Fancaster had no legal representation, Comcast began its

massive promotion of the Fancast XFINITY TV website and announced its rebranding initiative.

Comcast also began laying out its vision for the Fancast XFINITY TV service and explained

how it planned to parlay that service into increased revenues.   Fancaster diligently sought new

counsel, who entered their appearances on March 19, 2010, three days earlier than the deadline

set by the Court.  Thereafter, Fancaster's counsel devoted substantial efforts to getting up to speed on the prior litigation, including obtaining and reviewing prior counsel's litigation files, analyzing discovery responses, obtaining and analyzing transcripts of depositions that Fancaster's prior counsel had never purchased and reviewing the tens of thousands of pages produced by Fancaster and Comcast.

Fancaster's new counsel became aware of Comcast's new infringing activities in April 2010 and after analyzing their impact, Fancaster brought the issue to the Court's attention at the earliest opportunity by a letter delivered to the Court a few days before the May 12, 2010 status conference.  There is simply no way that Fancaster could have raised Comcast's new infringing activities and sought leave to supplement its complaint any earlier than it did.

ii.    <u>Comcast Will Not Be Unduly Prejudiced.</u>

Even if Fancaster had delayed in seeking to supplement the complaint (which it did not), this would not justify denying Fancaster's motion for leave to supplement.  In *Johnson v. Knorr*, 130 F. App'x 552 (3d Cir. 2005), the district court denied a motion to amend a complaint that had been filed after the close of discovery on the basis that the motion was untimely and therefore prejudicial.  The Third Circuit reversed, holding that "[d]elay alone ... is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party." 130 F. App'x at 555 (quoting *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir.1978)).

Here Comcast will not be prejudiced—let alone "unduly prejudiced"—if Fancaster is permitted to supplement its complaint in light of Comcast's new infringing activities.  Comcast has known of Fancaster's FANCASTER® Mark since mid-2006, before it even launched the Fancast service.  It continued to use that infringing name while it built the Fancast.com website

10

and developed it into a top Internet destination.  And it again chose to ignore Fancaster's legal rights when it launched the Fancast XFINITY TV service.  Comcast cannot claim that it will be unduly prejudiced by the addition of its recent infringing activities when it consciously chose to engage in those activities in the midst of a lawsuit.

iii.   <u>Judicial Efficiency and the Policies of the Federal Rules Require that Fancaster be Permitted to Supplement its Complaint.</u>

Permitting Fancaster to supplement its complaint and to take discovery directed to the new factual allegations will serve the interests of judicial efficiency and the underlying policies of the Rules of Civil Procedure.  The Court has never established a deadline for amendments to the pleadings, nor has it set a deadline for the filing of dispositive motions.  Likewise, the Court has not set a trial date.

As this Court has observed, one of the basic policies underlying the Rules is that a party should be given "every opportunity" to join all of its claims in one lawsuit regardless of when they arose, in order to avoid multiple litigations and provide a complete adjudication of the dispute.  *Tormasi*, 2010 WL 1878961 at *2; *Hassoun*, 126 F. Supp. at 360; 6A C. Wright & A. Miller §1506.   This policy is best served by permitting  Fancaster to supplement its complaint to reflect Comcast's new infringing activities (and to take necessary discovery as described below).

iv.   <u>Supplementation is Necessary to Permit Fancaster to Fully Litigate its Claims and to Obtain the Relief to Which it is Legally Entitled, Including Comcast's Profits.</u>

At the status conference on May 12, 2010, Comcast's counsel acknowledged that Comcast's new use of Fancast in connection with the Fancast XFINITY TV service would be barred should Fancaster obtain an injunction based on its existing complaint.   Comcast's counsel therefore suggested that supplementation was not warranted and would serve no purpose.  This is incorrect.  Mere injunctive relief is not a sufficient remedy for Comcast's deliberate infringing

11

activities and to conclude otherwise would be to strip Fancaster of the remedies to which it is entitled by statute.  Sections 34 and 35 of the Lanham Act separately provide for injunctive and monetary relief.  15 U.S.C. §§1116 and 1117.  As a monetary remedy for infringement, the Lanham Act provides three avenues of recovery: (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  15 U.S.C. §1117(a).  In addition, case law has established a right to recover the cost of corrective advertising necessary to address the impact of advertising by the infringing party.

Comcast did not begin the new infringing activities until well after the close of fact discovery.  It necessarily follows that Fancaster has obtained no discovery at all as to Comcast's activities, its profits from that activity, or its advertising campaigns and the costs thereof in order to formulate a corrective advertising remedy.  Nor has Fancaster had the opportunity to obtain expert analysis of the profits and corrective advertising theories of recovery for Comcast's new infringement.  Fancaster requires this discovery in order to avail itself of the remedies to which it is entitled under the law.

During the May 12, 2010 status conference, Comcast's counsel represented to the Court that Fancaster's prior counsel had waived Fancaster's right to seek one of the three categories of statutory remedies for infringement.  This assertion certainly has no basis as applied to conduct and profits that did not commence until two months after the letter was written.  Moreover, even as to Comcast's already-generated profits, it is wrong.  Comcast's counsel asserted that in a letter dated October 9, 2009, Fancaster's counsel had described the remedies that Fancaster was seeking and that in a subsequent conversation at a deposition, Fancaster's counsel had agreed that the letter could be treated as a supplemental interrogatory response.  A copy of that October

9, 2009 letter was provided to the Court at the status conference and is attached hereto as **Exhibit A**. The letter does not support Comcast's position.

Fancaster's prior counsel prepared the October 9, 2009 letter after Comcast had taken second of three full days of depositions of Mr. Krueger.[1]  During the second day of testimony, on September 15, 2009, Comcast's counsel repeatedly asked Mr. Krueger to describe the economic damages that Fancaster had suffered as a result of Comcast's infringement.  In response to this questioning, Mr. Krueger identified a series of economic damages, which included the following: (i) lost ability to expand into new markets; (ii) lost goodwill and reputation; (iii) lost corporate identity; (iv) lost time and focus on the business as a result of the litigation and confusion created by Comcast's actions; (v) emotional distress; (vi) out-of-pocket costs associated with the litigation; and (vii) attorney fees for the litigation.  At the conclusion of this line of questioning, the following colloquy took place:

> Q.  … I'm asking you now to tell me how you're going to quantify and what dollar amount you're going to say you're entitled to to compensate you for losses you've suffered to reputation, to goodwill, to corporate identity, to brand identity. …
>
> A.  I don't know how to calculate that.
>
> Q.  Are you going to be able to testify at court about those numbers without a damages expert?
>
> A.  I don't know.
>
> Q.  And how are you going to figure that out?
>
> A.  I'm going to continue to talk to all of our consultants and counsel.

---

[1] It is far from clear to Fancaster's current counsel what possible basis there could have been for Fancaster's prior counsel's decision to permit Comcast to take three full days of depositions of Mr. Krueger in view of the presumptive limit of a single 7 hour day under Fed. R. Civ. P. 30(d)(1).

13

MR. JANKLOW: This is terribly unusual, and I know, could we provide you that information within the next three weeks let's say? I'll get the transcript and we'll have—and I realize—

MR. MASTERS: That's fine. … Mr. Janklow, we've got some other areas. We've got losses relating to lack of ability to expand into new markets. We've got losses as a result of lost time and focus. We've got losses related to his need to address issues and confusion. We've got emotional injury and pain and suffering. Is it the case that you're going to supplement the numbers with regard to all of those?

MR. JANKLOW: Yes. Either that or I'll stipulate that you'll get the opportunity to subsequently examine him by deposition on those specific points.

(Krueger Depo. Tr., Vol. II at 340-372, attached as **Exhibit B**.)

Mr. Janklow's October 9, 2009 letter was the promised follow-up on these issues, and stated that Fancaster continued to suffer damages to its goodwill and reputation and to be damaged by the costs and attorney fees it was incurring in the litigation and by Comcast's massive advertising activities, for which Fancaster was seeking corrective advertising damages. The letter concluded with the following statement:

The other types of damages that Mr. Krueger testified to during his deposition are not the type for which we are going to seek compensatory relief in this action.

(**Exhibit A** at 2.) In context, Mr. Janklow was simply advising Comcast's counsel that Fancaster would not seek to recover compensatory damages for lost ability to expand into new markets, lost time and focus on the business, and emotional distress.

Comcast did not postpone the depositions and did not seek relief from the Court. Instead, at the beginning of the third day of Mr. Krueger's deposition, Comcast's counsel asked whether Mr. Janklow's letter could be treated as a supplemental interrogatory response:

MR. MASTERS: Secondly, we have had some exchanges by letter and e-mail regarding damages. And rather than make you guys supplement the Discovery request, I'm wondering if you would

14

> just agree that we would treat those as though they were given by
> the party with the verification so that we can just treat those as
> though they were interrogatories answers?

> MR. JANKLOW:  That's correct.  No problem.  Yes, sir.

(Krueger Depo. Tr. Vol. III, Oct. 15, 2009, at 545, attached as **Exhibit C**.)

To the extent that the October 9, 2009 letter was to be treated as a supplemental response to Comcast's interrogatories, it can only have supplemented Interrogatory 12:

> 12.  Set forth and describe in detail the amount and nature of all
> damages suffered by Fancaster/Krueger as alleged in the
> Complaint.

This interrogatory asks only about the economic damages "suffered by" Fancaster as a result of Comcast's infringing activities.  Comcast's profits are a statutory remedy under 15 U.S.C. § 1117 and do not directly represent Fancaster's economic damages.  In fact, they can constitute a remedy to deter willful infringement such as has occurred here.  Fancaster's statutory claim for profits is therefore not responsive to this Interrogatory.

This Court has rejected the idea that a trademark infringement plaintiff may be deemed to have implicitly waived its statutory right to recover the defendants' profits.  In *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332 (D.N.J. 2001), Pennzoil took almost exactly the position that Comcast appears to take here.  The Court categorically rejected the argument:

> Pennzoil's arguments that the pleading failed to use the term
> 'disgorgement,' that no evidence of Pennzoil's profits was
> introduced at the merits trial, and **that Castrol waived or
> abandoned its right to disgorgement when Castrol advised that
> it did not seek compensatory damages are faux issues and
> without substance**. Indisputably, the term 'monetary damages,'
> pled by Castrol, would include disgorged profits. Furthermore, the
> Lanham Act unequivocally provides for recovery of a defendant's
> profits by a prevailing plaintiff, subject to the principles of equity.
> Of equal importance is the fact that Castrol never represented to
> Pennzoil or the Court that it would not seek an accounting for
> disgorgement of profits. An examination of the trial record is
> devoid of any language of waiver or abandonment of this type of

15

> relief. It is hornbook law that 'waiver' is an intentional
> relinquishment or abandonment of a known right or privilege.
> Castrol never abandoned its right to disgorge Pennzoil's profits.

169 F. Supp. 2d at 343-44 (emphasis added).  The Court commented that it would not "attribute

naïveté to Pennzoil's most professional and fully experienced trial counsel.  They understood the

meaning of the term 'monetary damages' as used in Castrol's complaint and were equally aware

of the remedies available to Castrol under the Lanham Act."  *Id.*

Comcast's counsel is no less professional than Pennzoil's counsel, and cannot reasonably

have understood Mr. Janklow's letter as waiving an explicit statutory remedy.  This is especially

true here, because not only is there nothing in the trial record explicitly waiving such relief, but

in fact Mr. Krueger expressly claimed such relief in his response to Comcast's Interrogatory No.

10 and again during his deposition testimony.  (Krueger Depo. Tr. Vol. II at 354-358, **Exhibit D**

hereto; **Exhibit E** hereto.)  In the unlikely event that Comcast's counsel was unsure whether Mr.

Janklow intended to subtly waive one of the major statutory remedies for trademark infringement

by referring to specific compensatory theories to which Mr. Krueger had testified, it was

incumbent upon Comcast's counsel to seek clarification.

As a matter of law, Fancaster never waived its statutory right to recover Comcast's

profits under 15 U.S.C. §1117 for any of Comcast's infringing activities that formed the basis for

Fancaster's existing complaint, and Fancaster intends to present evidence of Comcast's profits

and to seek that remedy at trial.[2]

---

[2] Although Comcast refused to comply with Fancaster's discovery requests directed to
Comcast's profits, Fancaster *does not seek to reopen discovery* on this point.  By law,
Fancaster's only obligation is to prove Comcast's gross revenues, and it is Comcast's burden to
establish all appropriate deductions from those gross revenues. 15 U.S.C. §1117(a).  Fancaster
will satisfy its burden without any additional discovery.

In any event, while it is clear from the record that Fancaster did not waive its statutory right to recover any of Comcast's profits, it is legally impossible for Mr. Janklow's October 9, 2009 letter to have implicitly waived Fancaster's right to Comcast's profits for the new infringing activities that Comcast did not even announce begin for more than two months after the letter. As the *Castrol* court observed, "It is hornbook law that 'waiver' is an intentional relinquishment or abandonment of a known right or privilege." 169 F. Supp. 2d at 343-44. Fancaster could not have intentionally relinquished a known right to recover Comcast's profits when the infringing activities that created that right had not occurred. Accordingly, should the Court grant Fancaster's request for leave to file a supplemental complaint and to take limited discovery directed to the new allegations, Fancaster does plan to seek discovery relating to Comcast's profits from the new infringing activities, which Fancaster expects will be substantial.

### C. Fancaster Should Be Permitted To Take Discovery On Comcast's New Infringing Activities, Including Damages-Related Discovery, and to Serve Expert Reports Reflecting the Newly Discovered Information.

The interests of justice and judicial efficiency and the policies underlying the Rules all mandate that Fancaster be permitted to file a supplemental complaint alleging Comcast's new infringing activities that began in late 2009 or early 2010 and that continue today. As these events all occurred long after Fancaster initiated this litigation, could not have been the subject of Fancaster's discovery requests, and did not happen until well after the close of fact discovery, Fancaster must be given the opportunity to take discovery on these new facts. Fancaster understands the Court's concern over the course of the litigation to-date and Fancaster's counsel has no desire and no intention to prolong this litigation; to the contrary, Fancaster wishes to proceed as expeditiously as possible to dispositive motions and trial.

17

**D.  The Court Should Enter A Scheduling Order That Provides Sufficient Time for Fancaster To Obtain Necessary and Appropriate Discovery Directed to Comcast's New Infringing Activities and Fancaster's Legal Remedies.**

As previously stated, Fancaster ***does not seek to reopen discovery on Comcast's infringing activities prior to the close of fact discovery***, but only seeks discovery with respect to Comcast's infringing activities that began in late December 2009.  This discovery includes factual discovery as to Comcast's new infringing activities as well as financial discovery focused on those same infringing activities.  Fancaster anticipates that it will be able to obtain the necessary discovery relatively quickly and with a relatively small number of written discovery requests and depositions.  Obviously, Fancaster's ability to do so depends heavily on Comcast's responses to the discovery requests and preparation of its deposition witnesses.  On the assumption that Comcast will abide by its discovery obligations and cooperate with Fancaster in scheduling depositions, Fancaster asks the Court to enter a scheduling order with the following provisions:

- Plaintiff be allowed to serve no more than 5 interrogatories and 10 document requests within 5 days of the Court's order

- Following defendants' responses to interrogatories and production of documents, Plaintiff will be given a 45 day period to notice no more than 4 depositions of Comcast witnesses, including a Rule 30(b)(6) deposition notice addressed to defendants

In addition, Fancaster anticipates that it will need to engage the services of one or more experts to provide analysis and testimony on damages issues arising out of the new infringing activities.  Fancaster therefore asks that the Court set a deadline for expert disclosures relating to the new Comcast infringing activities and for expert depositions.   Due to the withdrawal of

18

Fancaster's prior counsel, no expert depositions have yet occurred, and Fancaster submits that it makes little sense to conduct any expert depositions until the parties have exchanged expert reports on the new infringement issues.  Accordingly, Fancaster asks that the Court order that:

- Following the conclusion of the above fact depositions, the parties will be given 45 days to exchange expert reports addressing the issues raised in the newly added portions of the supplemental complaint;

- Thereafter the parties will have 30 days to exchange rebuttal reports;

- Expert discovery will close 60 days after exchange of rebuttal reports (earlier if possible, but Fancaster suggests that the schedule should account for the likelihood that experts and other witnesses will have previously-scheduled vacations during the summer);

- A status conference be held to address future scheduling, including summary judgment motions and trial

## CONCLUSION

For the foregoing reasons, Fancaster respectfully requests that the Court grant Fancaster leave to file a supplemental complaint and enter a scheduling order that provides time for Fancaster to obtain required factual discovery and for the parties to engage in expert discovery.

> **PASHMAN STEIN**
> A Professional Corporation
> Attorney for Plaintiff and Third-Party Defendant
> **Fancaster, Inc. and Craig Krueger**

DATED:  May 21, 2010                    By:  _/s/ Sean Mack_____
                                               SEAN MACK


> Mitchell J. Matorin (*pro hac vice*)
> Matorin Law Office, LLC
> 200 Highland Avenue
> Suite 306
> Needham, MA 02494

T:  (781) 453-0100
F:  (888) 628-6746
E:  mmatorin@matorinlaw.com

Michael P. Boudett (*pro hac vice*)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02110
T: (617) 832-1000
E:  mxb@foleyhoag.com

*Counsel for Fancaster, Inc.*
*and Craig Krueger*