<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| FANCASTER, INC., | Civ. No. 08-2922 (DRD) |
| Plaintiff, | |
| v. | **O P I N I O N** |
| COMCAST CORPORATION, COMCAST INTERACTIVE MEDIA, LLC, and COMCAST MANAGEMENT, LLC, | |
| Defendants/Counterclaimants/Third Party Plaintiffs | |
| v. | |
| FANCASTER, INC. sometimes d/b/a "TARGET WIRELESS | |
| Counterclaim-Defendant, | |
| and CRAIG KRUEGER, | |
| Third-Party Defendant. | |

*Appearances by:*

PASHMAN STEIN PC
by: Michael S. Stein, Esq.
    Sean Mack, Esq.
21 Main Street, Suite 100
Hackensack, New Jersey 07601

MATORIN LAW OFFICE, LLC
by: Mitchell J. Matorin, Esq.
200 Highland Avenue, Suite 306
Needham, Massachusetts 02494

FOLEY HOAG LLP
by: Michael P. Boudett, Esq.
155 Seaport Boulevard
Boston, Massachusetts 02110

     *Attorneys for Plaintiff*

LOEB & LOEB LLP
by: Jodi Sarowitz, Esq.
    Douglas N. Masters, Esq.
    Tal E. Dickstein, Esq.
345 Park Avenue
New York, New York 10154

     *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

This matter arises out of a lawsuit between two companies that offer online video content via their respective websites. On June 12, 2008, Fancaster, Inc. ("Fancaster") filed a Complaint against the Comcast Corporation, Comcast Interactive Media, LLC, and Comcast Management, LLC (collectively referred to as "Comcast"), asserting claims for trademark infringement, 15 U.S.C. § 1114(1), false designation of origin, unfair competition, and trade name infringement, 15 U.S.C. §§ 1125(a), 1117(a), cybersquatting, 15 U.S.C. § 1125(d), under the Lanham Act, and trademark misappropriation, unfair competition, and deceptive practices under N.J.S.A. 56:4-1 and New Jersey common law, and seeking treble damages, attorney's fees, and injunctive relief.

On June 24, 2008, Fancaster filed an Amended Complaint to add claims for unjust enrichment and trade name infringement under New Jersey law.  On September 18, 2008, Comcast answered and asserted counterclaims against Fancaster and claims via a Third-Party Complaint against Fancaster's President, Craig Krueger, for fraud on the United States Patent and Trademark Office ("PTO"), 15 U.S.C. § 1120, and cyber piracy, 15 U.S.C. § 1125(d), and seeking damages, lost profits, attorney's fees, declaratory judgment that the Fancaster mark was (1) abandoned; (2) not used in commerce; and (3) obtained and/or maintained by fraud, 15 U.S.C. §§ 1064, 1119, and injunctive relief.  On November 1, 2010, Fancaster filed a Supplemental Complaint setting forth allegations of continued infringement.

On April 29, 2011, Comcast filed a Motion for Summary Judgment on all of Fancaster's claims, pursuant to Federal Rule of Civil Procedure 56(a), as well as a Motion in Limine to exclude the reports and testimony of Fancaster's damages expert, pursuant to Federal Rule of Evidence 702, 703, and 403.  That same day, Fancaster and Mr. Krueger filed a Motion for Summary Judgment on Comcast's counterclaims and third-party claims, pursuant to Federal Rule of Civil Procedure 56(a), and a Motion to Strike Comcast's affirmative defenses of fraud, unclean hands, laches, and acquiescence, pursuant to Federal Rule of Civil Procedure 12(f).  On May 5, 2011, Fancaster filed a Motion in Limine to exclude the reports and testimony of Comcast's PTO and cyber piracy law experts and a Motion in Limine to exclude the surveys conducted by Comcast's consumer confusion expert and his testimony, both pursuant to Federal Rule of Evidence 702, 703, and 403.

For the reasons set forth below, Comcast's Motion for Summary Judgment is GRANTED in part and DENIED in part.  Fancaster's infringement-related claims are dismissed because the record does not support a likelihood of confusion among the marks at issue in this case.  In

addition, Fancaster is not entitled to seek corrective advertising as a remedy for those claims.[1] However, Fancaster's cyber piracy claim must remain this case because Comcast only addressed that claim in its reply brief.

Fancaster's and Mr. Krueger's Motion for Summary Judgment is also GRANTED in part and DENIED in part.  Comcast's claim for fraud on the PTO is dismissed because there is no evidence in the record from which a jury could infer fraudulent intent.  Comcast's claim for declaratory judgment is also dismissed because it is duplicative of its claim for fraud on the PTO. However, Comcast's claim for cyber piracy may move forward as there remain factual questions regarding distinctiveness and bad faith.

Fancaster's Motions in Limine are GRANTED in part and DENIED in part.  The majority of testimony of Comcast's PTO and cyber piracy experts is excluded, while Comcast's consumer confusion expert's March 2009 survey and testimony related thereto is also excluded. Finally, Fancaster's Motion to Strike Comcast's affirmative defenses of fraud, unclean hands, laches, and acquiescence is GRANTED.

## I.  BACKGROUND

### A.    The Fancaster Mark

On June 13, 1989, Fancaster's president and sole director, Craig Krueger, registered the term FANCASTER with the PTO for use as a trademark in connection with "broadcasting services."  (Dickstein Decl. [ECF No. 130], Ex. 11.)  In doing so, he swore under oath that he "'has adopted and is using the trademark shown in the accompanying drawing for the following goods: communications' and/or 'broadcasting services,' and that '[t]he trademark was first used on the goods in Interstate commerce on July 15, 1988; and is now in use in such commerce.'"

---

[1] As indicated below, in Note 44, this moots Comcast's Motion in Limine to exclude the testimony and report of Fancaster's damages expert.

(Perry Cert. [ECF No. 138] ¶ 2).  The mark incorporates a pair of headphones turned on their side to take the place of the letter "C" so as to indicate that the mark relates to broadcasting.  On September 8, 1994, Mr. Krueger filed a Combined Affidavit of Use and Incontestability for the FANCASTER mark with the PTO.  In that affidavit, Mr. Krueger swore that he "was using the mark in commerce in connection with the broadcasting services that were stated in the registration, and had been doing so for five consecutive years."  (Id. ¶ 14.)  As evidence of such use, he submitted blank letterhead and envelopes bearing the FANCASTER mark.

Over the years, Mr. Krueger used the mark in connection with a variety of activities, including selling Fancaster branded radios, see (Id., Exs., 14, 21, 22), charging customers to watch closed- circuit boxing matches, producing karaoke shows, see (Id., Ex. 4, 694:21-296:23), transmitting sponsored news messages to wireless pagers and cell phones, and conducting live demonstrations of FANCASTER broadcast services, see (Id., Exs., 13, 16, 19).

### i.    Fancaster.com

On July 22, 2006, Fancaster launched its website, facaster.com.  On the site's homepage is the most recent version of the FANCASTER mark, which appears in light-blue lowercase lettering, and incorporates the aforementioned headphones taking the place of the letter "c".[2] Under the word "fancaster" appears the phrase "welcome to planet fancaster!" in gold lettering. Fancaster.com offers a wide variety of short video clips, most of which feature sports-related content and a sports fan or athlete speaking into a microphone displaying the fancaster mark to discuss a particular sporting event, sports team, or sports fans in general.  A screenshot of fancaster.com, dated April 21, 2011, categorizes the video clips on the site as follows: Fancaster Picks, Football, Baseball, Basketball, Play-By-Play, Horse Racing, Extreme Sports, Mixed

---

[2] The Court will therefore refer to the FANCASTER mark in lowercase letters when discussing it in connection with fancaster.com.

Martial Arts, Celbrities, Hockey, Body Building, Autographs, Other, Tennis, Mayhem, Auto, European Events, Golf, Food, Cycling.  (Dickstein Decl. [ECF No. 130], Ex. 17.)  Mr. Krueger testified that a unifying theme of the video clips on fancaster.com, no matter what category they fall under, is that they all involve broadcasting: "[e]veryone is speaking into a microphone and being recorded."  (Id., Ex. 6 at 64.)

According to Facaster's October 2009 business plan, "Fancaster is an early-stage Company that intends to develop a 21st century communications portal where user-generated video content is created by the fans and for the fans who want to emulate broadcasters or submit commentary on management, coaches, players, or teams."  (Id., Ex. 13 at 4.)  Fancaster also "intends to produce content that traditional media ignore, such as videos of fans at unique events such as La Tomatina in Spain, Ostrich racing in Arizona, the Westminster Kennel Club Dog Show and the annual Nathan's Hot Dog Eating Contest."  (Id. at 6.)

The business plan further states that "[t]he target market initially will be sports fans.  The Company contemplates, however, expansion of its offerings to include both music and movie fans at later stages.  For sports fans, Fancaster intends to focus on the ever-capricious but nonetheless influential demographic of 18-to-35 year old males."  (Id. at 4.)  As of October 2009, Fancaster identifies "other fan sites such as www.fannation.com as well as larger user-generated and social networking sites such as YouTube and Facebook" as competitors.  (Id. at 6.)

Mr. Krueger has marketed fancaster.com online on a few sports-oriented websites and those of several local pubs; however, he testified that most of Fancaster's marketing efforts have not been geared toward the Internet.  See (Id., Ex. 6 at 194-195.)  He has instead focused marketing the website at sporting events, bars, on local television channels in Sioux Falls, South

Dakota and Sioux City, Iowa, on radio stations in Charleston, South Carolina, and via flyers and handbills.

**B.     Comcast's "The Fan"**

Comcast, the well-known cable and broadband provider, offers television programming and movie channels to millions of customers across the United States.  In 2003, Comcast began developing a means to deliver this content over the Internet.  On November 20, 2003, Comcast launched a multi-media player on its website, Comcast.net, that allowed users to watch cable television programming online.  That player was called "The Fan" because it displayed available video content in a circular pattern that resembled a fan.  On October 17, 2003, Comcast filed an application with the PTO to register "TheFan" as a trademark.  On May 14, 2004, the PTO rejected Comcast's application "on the ground that the mark was likely to be confused with the mark THE FAN for radio broadcasting services, owned by IBC Merger Corp."  (Boudett Decl. [ECF No. 160], Ex. 66.)  On November 15, 2004, Comcast filed a document labeled "RESPONSE TO OFFICE ACTION DATED 5/14/04" in which it asked the PTO to reconsider its rejection of Comcast's application.  (Id.)  In doing so, it listed a number of "marks that have been registered for related services and include the phrase "THE FAN," including the FANCASTER mark.[3]  (Id.)

**C.     Comcast's FANCAST[4]**

Comcast later sought to develop a stand-alone version of "The Fan" that would be available on a separate website.  During the winter of 2006, Comcast paid an independent

---

[3] Comcast ultimately appealed the PTO's decision to the Trademark Trial and Appeal Board, which affirmed on July 5, 2006.  On October 5, 2006, Comcast abandoned its application to register "The Fan".

[4] The Court will refer to the FANCAST mark in uppercase letters because that is how it appears on fancast.com.

branding agency to conduct research and testing of possible names for this new media player.
The agency was of the understanding, among other things, that (1) "[t]he name should help
communicate that Website X is the ultimate interactive destination for TV and Movie fans," and
(2) "the name should somehow tie back to Comcast, [but] the name Comcast should not be
used."  (Young Decl. [ECF No. 131], Ex. 1.)  Using these criteria, the agency generated twenty-
three potential names.

      During the spring and summer of 2006, Comcast hired another branding agency to devise
potential names under similar criteria.  According to the agency's reports, Comcast's primary
target was 29-54 year-olds, of which 60% are female and 40% are male, that use "portal-centric
authority sites" such as MSN, AOL, Amazon.com, ebay.com, and Netflix.  (Id., Ex. 2.)
Comcast's secondary target was 18 to 28 year olds that use sites like YouTube.com, ifilm,
myspace.com, feedroom, atomfilms, Jib Jab, MeFeedia.com, and del.icio.us.  (Id.)  On June 23,
2006, the branding agency proposed the name "FanCast.com," in addition to five other names.
(Id., Ex. 4.)  Shortly thereafter, the agency conducted consumer research, which indicated that
"Fancast.com" performed the best overall.  In addition, two members of the team at Comcast in
charge of choosing a name for the new website testified that the FANCAST name was a logical
joinder of "The Fan" and the Comcast name.  See (Dickstein Decl. [ECF No. 130], Ex. 3, 4.)
Consequently, Comcast decided to use the FANCAST name and began developing its website.

      Comcast purchased the fancast.com domain name and filed an application with the PTO
to conduct business using the FANCAST mark in August of 2006.[5]  (Perry Cert., [ECF No. 138]

---

[5] Fancaster opposed the application, which remains in stasis pending resolution of this
litigation.  There had been three prior applications to register the word "Fancast," all of which
were rejected.  The 2003 application—which intended to use the mark in connection with
"entertainment services providing promotional marketing tool for collegiate athletic
departments"—was denied by the PTO due to a likelihood of confusion with Fancaster.
(Boudett Decl., [ECF No. 160] Ex. 56.)

Ex. 68); (Sarowitz Decl. [ECF No. 151], Ex. 9.)  Curiously, in September 2006, Fancaster began

registering large numbers of "fancast" domains.[6]  (Perry Cert. [ECF No. 138], Ex. 70.)

### i.    *Comcast's Meeting with Mr. Krueger*

On July 13, 2006, Mr. Krueger met with Comcast employees to pitch a program of his

called Mobile Voter.  At that meeting, he also pitched fancaster's services and website, which he

advised was about to be launched.  Five days later, Mr. Krueger discovered that Fox SportsNet

New England[7], a television channel owned by Comcast, had an amateur broadcasting segment

called Fancaster where young sports fans audition to appear on live television during

professional sporting events.  The segment is intended to encourage young people to pursue

careers in television broadcasting.  Fancaster segments are publicly posted on the CSNNE

website.  Mr. Krueger initially demanded that CSNNE cease and desist from using the Fancaster

mark.  However, after learning more about the nature of the program, he decided not to sue but

reserved the right to do so if the program changed.  On July 25, 2006, Comcast informed Mr.

Krueger that discussions regarding a potential business relationship were suspended "due to

infringement issues surrounding Fancaster.com."  (Boudett Decl., [ECF No. 160] Ex. 107.)

### ii.   *Comcast Launches Fancast.com*

In January 2008, Comcast launched a fully operational version of the FANCAST website

that allowed users to watch full-length premium mainstream media over the Internet, including

---

[6] These websites include: fancast.co.uk, fancast.org, fancast.us, fancast.eu, fancast.bz, fancast.cc, fancast.com, fancast.gs, fancast.ms, fancast.name, fancast.tc, fancast.tw, fancast.vg, fancast.ws, fancast.au, fancast.com.au, fancast.mobi, fancast.net.au, fancast.nz, fancast.jp, fancast.la, fancast.br.com, fancast.kr.com, fancast.qc.com, fancast.za.com, fancast.es, fancast.eu.com, fancst.gb.com, fancast.uk.com, fancast.us.com, fancast.am, fancastfm, facast.pro, fancast.tel, fancast.cm, fancast.me, and fancast.co.nz.

[7] Fox SportsNet New England was later rebranded as Comcast SportsNet New England ("CSNNE").

television programming from basic channels like ABC, CBS, NBC, and Fox, as well as full-length studio movies offered by premium cable channels like HBO and Showtime.  Indeed the FANCAST homepage states that visitors can use the site to "Watch Full TV Shows and Movies." (Id., Ex. 44); (Poret Decl. [ECF No. 164], Appx. E.)  The FANCAST website also offers certain sports-related television and movie content.  FANCAST did not offer any user-generated content whatsoever.

Fancast.com features the FANCAST mark that appears in uppercase black letters next to a pastel "expanding universe design."  (Def. Br. [ECF No. 128] 3. )  According to Comcast, the mark was intended "[t]o emphasize that FANCAST aggregated all forms of popular premium television and movie content."  (Id.)

Comcast marketed FANCAST to a national audience that consumes mainstream media. (Young Decl. [ECF No. 131] ¶ 4.)  Comcast bought advertisements in various mainstream print publications, including The New York Times, LA Times, USA Today, Entertainment Weekly, and on television channels distributed via Comcast's cable television service.  Comcast also bought banner ads on Comcast.net and other websites focused on popular TV and movies, such as TVGuide.com.  In addition, Comcast purchased ads on internet search engines that would appear when users searched for keywords related to the names of specific television shows available on fancast.com, or terms such as "watch TV shows online."  (Id. ¶ 4.)

### iii.    *Comcast Dismantles Fancast.com and Starts XfinityTV.com*

By late 2009, Comcast had lost roughly $80 million on the FANCAST website, which relied entirely on advertising revenue.  According to Comcast, this was due to "the unexpectedly high cost of distributing video content on the internet."  (Id.)  Therefore, Comcast began to phase out the FANCAST service by offering a website branded "FANCAST Xfinity TV", which was

functionally identical to the existing FACAST website, but allowed Comcast cable subscribers to access certain premium cable television content through a service called Xfinity TV.  By the end of March 2011, Comcast took down the FANCAST website entirely and instead offered the Xfinity TV service exclusively to subscribers.  All web traffic to www.fancast.com was redirected to www.Xfinitytv.com.

**D.      The Instant Lawsuit**

On June 12, 2008, Fancaster filed a Complaint against Comcast asserting claims for trademark infringement, false designation of origin and unfair competition, trade name infringement, and cybersquatting under the Lanham Act, and trademark misappropriation, unfair competition and deceptive practices under New Jersey law, and seeking treble damages, attorney's fees, and the following injunctive relief against "Defendants, their officers, agents, servants, attorneys, and all those persons in active concert and participation with them": (1) a permanent injunction from using the FANCAST mark or any other mark "confusingly similar to Fancaster's FANCASTER mark" (Compl. [ECF No. 1] ¶ 9(a)); (2) and order requiring them "to deliver to the court for destruction, or show proof of destruction of, any and all products, labels, signs, prints, packages, wrappers, receptacles, marketing materials and advertisements in Defendants' possession or control which use or depict the designation FANCAST, or any other mark or name that is confusingly similar to Fancaster's FANCASTER mark" (id. at ¶ 9(b)); (3) an order "to file with the court and serve upon Fancaster, within thirty (30) days after entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction" (id. at ¶ 9(c)); and (4) an order "to transfer to Fancaster ownership of the domain name registrations for www.fancast.com, www.phancast.com, www.fancas.com, www.fancst.com,

www.fancastic.com, and any other domain names containing the design or designation

FANCAST," or any other mark or name that is confusingly similar to Fancaster's FANCASTER

mark (id. at ¶ 9(d)).

On June 24, 2008, Fancaster filed an Amended Complaint to add claims for unjust

enrichment and trade name infringement under New Jersey law.  On September 18, 2008,

Defendants answered and asserted counterclaims against Fancaster and claims against Mr.

Krueger for fraud on the PTO and cyber piracy, and seeking damages, lost profits, attorney's

fees, declaratory judgment that the Fancaster mark was (1) abandoned; (2) not used in

commerce; and (3) obtained and/or maintained by fraud, and the following injunctive relief

against Mr. Krueger and Fancaster, and their agents servants, employees, attorneys, and all

others in active concert and participation with any of them: (1) a permanent injunction "from

registering or using, directly or indirectly, 'www.fancast.org' or any other domain name that

contains the FANCAST mark, or any colorable imitation, simulation or typographical variation

of it, either alone or in combination with any other term, or any domain name that is confusingly

similar to any of the above" (Def. Compl. [ECF No. 8] ¶ 60(e)), (2) an order requiring Mr.

Krueger and Fancaster to (i) "assign to Comcast the registration of, and all rights in and to, the

domain name www.fancast.org as well as any other domain name covered" by the injunction (id.

at ¶ 60(f)(1)); (ii) "take all steps necessary to effectuate the transfer to Comcast of the domain

name www.fancast.org, as well as any other domain name covered" by the injunction (id. at ¶

60(f)(2)); and (iii) "file with this Court and serve on Comcast a report in writing under oath

setting forth in detail the manner and form in which Fancaster and Krueger have complied with

the terms of any injunction entered by this Court" (id. at ¶ 60(f)(8)), and (3) an order cancelling

the FANCASTER trademark.

On February 23, 2009, Defendants filed an Amended and Supplemental Answer and Counterclaims setting forth additional allegations in support of their counterclaims, and seeking similar relief as that sought in their initial answer and counterclaims.[8]  On November 1, 2010, Fancaster filed a Supplemental Complaint setting forth allegations that Comcast's Xfinity TV services and website constitute further infringement of the FANCASTER mark, and asserting the same causes of action and seeking the same relief as in its Amended Complaint.

**E.      Proposed Evidence of Potential Confusion Between Fancast.com and Fancaster.com**

    ***i.      Internet Searches***

Fancaster submits a number of screenshots, dated between May 31, 2009 and April 22, 2011, reflecting the results of internet searches using a variety of search engines, including Google, Yahoo!, AOL, Altavista, Bing, and Dogpile, for the following search terms: "fancaster", "fancaste", "fanc", "fanca", "fancas", "fancast", and "+fancaster".  See (Boudett Decl., [ECF No. 160] Exs. 18-27, 30.)  Those screenshots indicate that when one inputs one or more of those terms into those search engines, the results include (1) paid sponsored links to fancast.com and "xfinitytv.fancast.com"; (2) organic (i.e. non-sponsored) links to CSNNE's Fancaster and www.fancast.com; and/or (3) suggested search terms for "fancast", "fancaster comcast", "FanCaster Comcast", "fancast review", and "fancast xfinity tv", among others.  See (id.)

    ***ii.      Overlapping Content***

        1.   Sports

---

[8] Comcast further sought (1) declaratory judgment that the Fancaster mark was also renewed by fraud and (2) to expand the scope of the proposed injunction to include a number of other domain names registered to Mr. Krueger.

Fancaster submits a number of screen shots to show that both fancast.com and fancaster.com feature sports-related content.  Specifically, Fancaster submits undated[9] screen shots of (1) the fancast.com homepage, which features a tab that a user can click to view sports videos; (2) fancast.com's sports section, which states, "XFINITY – Home of the Most Live Sports", and offers the following categories of video content: "Highlights", "NFL Videos", "College Sports Videos", "NBA Videos", and "The Best of Sports TV"; and (3) fancaster.com's aforementioned "Categories" section indicating that Fancaster also provides sports-related videos, including those relating to football, baseball, and basketball.  See (Boudett Decl. [ECF No. 160], Ex. 44.)

Fancaster also submits screenshots, dated March 21, 2011 and May 3, 2011, of Google search results for the terms "fancast sports", "fancast baseball", "fancast basketball", "fancast kentucky derby", "fancast breeder's cup", "fancast nfl lockout", "fancast sports trivia", "fancast trivia contest", and "fancast trivia",—all of which provide links to fancast.com.  See (id., Exs. 31, 32, 35, 37, 38, 39, 44.)  Fancaster juxtaposes these screenshot with screenshots of fancaster.com offering video clips related to those search terms.  See (id.)

Specifically with respect to basketball, Fancaster submits screenshots, dated March 27, 2011, of (1) fancast.com's page entitled "CBS Sports NBA" featuring short video clips of "[t]he latest from around the NBA, including news, player interviews and press conferences, features, breakdowns of the biggest games, expert opinion, analysis and more"; (2) fancast.com's page entitled "Big Ten College Basketball" featuring similar short clips relating to college basketball; (3) a short video clip on fancast.com of a college basketball coach giving a press conference; (4) a short video clip on fancast.com of an interview with a college basketball coach; and (5) a short

---

[9] The screenshots of fancast.com indicate a date of December 22, but they do not indicate the year.  See (Boudett Decl., [ECF No. 160] Ex. 44.)  The screenshot of fancaster.com is wholly undated.  See (id.)

video clip on fancast.com of a college basketball player giving a press conference.  See (id., Ex. 31.)  Fancaster juxtaposes those screenshots with screenshots, dated May 3, 2011, from fancaster.com of short video clips related to college and professional basketball.  See (id.)

### 2.  Celebrities

Fancaster also submits a number screenshots to show that fancast.com and fancaster.com share celebrity-related content, including screenshots, dated May 3, 2011, of Google search results for the terms "fancast" followed by the name of a number of celebrities offering links to fancaster.com.[10]  See (id., Exs. 33, 34, 40, 41, 42, 43, and 45.)  Fancaster juxtaposes these screenshots with screenshots of video content on fancaster.com related to those celebrities.  See (id.)

### 3.  Other Content

Finally, Fancaster submits screenshots to show that fancast.com and fancaster.com share content beyond sports and celebrities.  Specifically, Fancaster submits screenshots, dated March 21, 2011, of Google search results for the terms "fancast chocolate show" and "chocolate show fancast" that offer links to fancast.com, juxtaposed with a screenshot, dated May 3, 2011, of chocolate-related video content on fancaster.com.  See (id., Ex. 36.)  Fancaster also submits (1) a screenshot, dated March 21, 2011, of Google search results for the term "fancast westminster" offering links to fancast.com, (2) a screenshot, dated September 3, 2009, of a page from fancast.com entitled "The Westminster Kennel Club Dog Show (1996-2009)" offering photos and video clips from the Westminster Kennel Club Dog Show, and (3) a screenshot, dated May

---

[10] These celebrities include the underground hip hop group-turned-pop sensation the Black Eyed Peas, Poison lead singer Bret Michaels, martial arts champion Chuck Liddell, actors Corey Feldman and Gilles Marini, boxer Laila Ali, and baseball legend Jackie Robinson.  See (Boudett Decl. [ECF No. 160], Ex. 33, 34, 40, 41, 42, 43, and 45.)  Fancaster offers screenshots of actual content from fancaster.com regarding Bret Michaels and Jackie Robinson.  See (Boudett Decl., Ex. 34, 43.)

3, 2011, of short video clips related to the Westminster Kennel Club Dog Show on fancaster.com.  See (id., Ex. 46.)

### iii.    Presence in Social Media Outlets

#### 1.    YouTube

Fancaster submits screenshots to show that both fancast.com and fancaster.com have videos posted on YouTube.  Specifically, Fancaster submits screenshots, dated May 3, 2011, of video clips on www.youtube.com depicting interviews with various celebrities.  See (Boudett Decl. [ECF No. 160], Ex. 47.)  Those screenshots feature the FANCAST mark either in the corner of the video, the title of the video, on the background wall of the set where the video was shot, and/or on the microphone being held by the interviewer.  See (id.)  However, the screenshots indicate that these videos were posted under a number of different YouTube usernames.  See (id.)  Thus, it is unclear whether these videos were posted on YouTube by Comcast or by individuals who culled them independently from fancast.com or another source without Comcast's permission.

Fancaster juxtaposes these screenshots with screenshots, dated May 3, 2011, of video clips on www.youtube.com depicting a celebrity interview and groups of fans reacting to certain sporting events.  See (id., Ex. 48.)  As with the purported FANCAST videos, the fancaster videos feature the fancaster mark either in the corner of the screen or on the interviewer's microphone.  See (id.)  However, In contrast to the purported FANCAST videos, the screenshots of the fancaster videos clearly indicate that they were posted by Fancaster's YouTube channel.  See (id.)

#### 2.    Facebook

Fancaster submits screenshots of the pages that it and Comcast (FANCAST) maintain on Facebook.  See (id., Exs. 49-50.)  However, the FANCAST page on Facebook advertises for "Xfinity" and directs visitors to www.xfinityTV.com.  See (id., Ex. 50.)

### 3.  Twitter

Finally, Fancaster submits screenshots of its and Fancast's respective Twitter feeds.  See (id., Exs. 51-52.)  The FANCAST Twitter page is a trivia site.  See (id., Ex. 52.)

### vi.  Survey Evidence

Comcast submits survey evidence to show that there is little risk of confusion between the FANCAST and fancaster marks.  Specifically, Comcast submits two surveys devised by Hal Poret, a consumer perception and trademark survey expert—in March 2009 and March 2011, respectively.  Mr. Poret intended for surveys to test for reverse confusion—a concept that will be discussed later in this opinion.  Based on these two surveys, Mr. Poret opines "that there is no likelihood of confusion created by Comcast's use of the mark FANCAST in connection with the Fancast website."  (Poret Decl. [ECF No. 132] ¶ 10.)

### 1.  The Survey Respondents

Mr. Poret chose respondents from "[c]omsumers who use or would be likely to use the internet to view, post, or discuss sports-related content" because they constituted Fancaster's "customers and prospective customers."  (Id. ¶ 11.)  Accordingly, he narrowed the survey universe to "males and females ages 16 or older who: (a) in the past 3 months have used an internet site to view, post, or discuss sports-related content; and/or (b) in the next 3 months are likely to use an internet site to view, post, or discuss sports related content."  (Id.)

Mr. Poret sampled from this universe by utilizing interviewing facilities at shopping malls around the United States.  Specifically, he chose two markets in each U.S. Census region

(Northeast, South, Midwest, and West) by sampling from metropolitan areas within those regions.  This sampling yielded the following markets: Chicago, Cleveland, Los Angeles, Miami, New York, Pittsburgh, Portland (OR), and Spartanburg (SC).  Mr. Poret then chose a mall in each market based on the capacity of its interviewing facilities.[11]

> 2.   The March 2009 Survey

The March 2009 survey used a format known as a Sequential Lineup.  That format involves "first exposing respondents to the defendant's mark prior to showing respondents the plaintiff's mark (as well as other marks), thereby simulating a scenario in which a consumer comes to learn about defendant's mark and then encounters plaintiff's mark."  (Id. ¶ 28.)  Out of 419 qualified respondents, Mr. Poret randomly assigned 209 to a Test Group and 210 to a Control Group.  Each respondent in the Test Group was shown a three-page printout of www.fancast.com.  The printout was taken away and the "[r]espondents were then instructed that they were going to be shown some websites and asked some questions."  (Id. ¶ 33.)  "One at a time, respondents were then shown and asked about four websites: (a) Fancaster.com; (b) Veoh.com; (c) Musicvideocast.com; and (d) Tvfanonline.com."  (Id. ¶ 34.)  In contrast to the printout if the FANCAST website, these websites were shown to respondents as static screenshots on a computer screen.

Respondents were not only shown facaster.com after viewing the fancast.com printout because, according to Mr. Poret, "[s]howing respondents plaintiff's service as but one of a number of services in a series created as close to a realistic consumer experience as possible." (Id. ¶ 35.)  Thus, Veoh.com, Musicvideocast.com, and Tvfanonline.com were shown in addition to Fancaster.com because "they all permit users to view, post and/or discuss various forms of

---

[11] Mr. Poret used the same malls for both the March 2009 and March 2011 surveys, except the mall in Cleveland.  At the time of the March 2011 survey, that mall's interviewing facilities were no longer operational.  Mr. Poret used a mall in Detroit as a substitute.

media-related content." (Id.) "Tvfanonline.com and Musicvideocast.com were specifically included because they are examples of the many websites that contain superficial name elements in common with [f]ancaster ('fan' and 'cast' respectively) but do not come close to being confusingly similar." (Id.)

Upon seeing each of the four websites, the Test Group respondents were asked whether they believed the given website and the printout were from (1) the "same company", (2) "different companies", or (3) whether they had no opinion. (Id. ¶ 36.) "Respondents who answered 'same company' were asked what made them think so." (Id.) "Respondents who did not answer 'same company' were asked a second question, namely, whether the company the current website is from is affiliated with or received authorization from the company the printed-out website is from." (Id. ¶ 37.) "Respondents who answered 'yes' were asked what made them think so." (Id.) This series of questions was given for each website. Mr. Poret then tallied the total number of respondents who said that fancaster was from or affiliated with the same company as FANCAST.

The same procedure was performed on the Control Group, except that group was shown a control website instead of the FANCAST website that was shown to the Test Group. The Control Group was intended "to measure the tendency of respondents to connect Comcast's website with [f]ancaster for reasons unrelated to Plaintiff's claims of infringement, including the possibility that respondents drew a connection between two websites merely because they both have "Fan" in the name." (Id. ¶ 41.) The control website presented the same content and format as the Fancast website, however, the FANCAST name was changed to FANWATCH. According to Mr. Poret, "[t]he Fanwatch page is an appropriate control because it left the content, format and overall image of the Fancast page the same, while changing the name to one

that is clearly non-infringing and would not be confused with Fancaster." (Id.)  Therefore, he maintains, "any difference in the Test and Control Results must be attributed to . . . the substitution of the 'watch' suffix for 'cast'". (Id. ¶ 42.)

Of the 209 respondents in the Test Group, 65 (31.1%) made a connection between Fancast and Fancaster.[12]  Of these 65, 21 (10% of the Test Group) indicated the similarity between the Fancast and Fancaster names for doing so.  Of the 210 respondents in the Control Group, 61 (29%) made a connection between Fancaster and Fanwatch.[13]  Of those 61, 18 (8.6% of the Control Group) indicated the similarity between the Fancaster and Fanwatch names for doing so.  Mr. Poret called this figure the "total noise level." (Id. ¶ 62.)  Mr. Poret subtracted the alleged 29% noise from the 31.1% Test Group confusion, amounting to a final potential confusion level of 2.1%.  According to Mr. Poret, this figure "indicates that the tendency of respondents to connect Fancaster to Fancast is no greater than the baseline level of survey noise, and [therefore] that the likelihood of real consumers confusing the two services due to name similarity is none or negligible." (Id. ¶ 63.)  Mr. Poret also found that "the connection between Fancaster and Fancast due to name similarity is actually no higher than the level of survey noise—i.e., the tendency of respondents in a survey to make a connection between names that have a superficial common element ("Fan") but clearly do not infringe." (Id. ¶ 65.)  Finally Mr. Poret found that "the 31.1% rate at which Test Group respondents connected Fancast and Fancaster is statistically equivalent to the rate at which they connected Fancast to the other

---

[12] 52 respondents (24.9%) indicated that the Fancaster website was from the same company as Fancast, and 13 (6.2%) indicated that Fancaster was affiliated with or received authorization from Fancast.

[13] 45 respondents (21.4%) indicated that the Fancaster website was from the same company as the Fanwatch website, and 16 (7.6%) indicated that Fancaster was affiliated with or received authorization from Fanwatch.

websites shown in the study: Musicvideocast (27.3%), Tvfanonline.com (33.0%) and Veoh (22.0%). . . . [and that] [t]his further confirms that the Test Group result for Fancaster does not rise above the level of typical survey noise."  (Id. ¶ 66.)

### 3.   The March 2011 Survey

In contrast to the March 2009 survey's Sequential Lineup format, the March 2011 used an Eveready format, under which "respondents are exposed only to use of one party's mark and are asked questions to see whether they confuse it with the other party's mark."  (Id. ¶ 27.)  "In the context of reverse confusion, an Eveready survey involves exposing respondents to the senior user's mark to determine whether it is mistakenly connected to the infringing junior user."  (Id.) Mr. Poret chose the Eveready format instead of the Sequential Lineup format for the March 2011 survey because, at that time, "the Fancast service had been in existence for an additional two plus years and consumers should therefore have had ample opportunity to become aware of the FANCAST mark."  (Id. ¶ 29.)

209 respondents participated in the March 2011 survey.  Instead of a printout, they were first "shown the current, live [f]ancaster web site (starting on the home page) and asked to take as much time as they needed to review it."  (Id. ¶ 45.)  They were also given a mouse and allowed to click around any section of the website.  "Respondents were then asked whether they had an opinion about what company the website they just saw is from."  (Id. ¶ 46.) "Respondents who did have an opinion were asked what company the website is from, and what made them think so."  (Id.)

"Respondents were next asked whether they think the company the website comes from provides any other services or operates any other websites."  (Id. ¶ 47.)  "Respondents who answered in the affirmative were asked to identify any such services or websites and to give their

reasons for why they think such services or websites are provided or operated by the company whose website they were shown." (Id.) "Finally, respondents were asked whether they think the company whose website they were shown is affiliated with or received authorization from any other company, and what makes them think so." (Id. ¶ 48.)

Of the 209 respondents, just two "(slightly under 1%) gave an answer indicating possible confusion with Comcast or Fancast in response to any survey question." (Id. ¶ 67.) According to Mr. Poret, this figure "is well within the range of typical survey noise."[14] (Id. ¶ 69.) In contrast, "[a] total of 52 respondents (approximately 25%) answered that the website shown to them comes from '[f]ancaster.'" (Id. ¶ 68.)

## F.    Evidence of Damages

Fancaster retained Weston Anson, chairman of an intellectual asset consulting firm that specializes in licensing, valuation, and expert services, for the sole purpose of "determin[ing] the level of corrective advertising expenditures needed" to cure any consumer confusion between FANCAST and fancaster. (Sarowitz Decl. [ECF No. 137], Ex. 11.) After reviewing various Comcast records, Mr. Anson found that, as of March 24, 2011, Comcast spent $83,067,778 in marketing and advertising the FANCAST mark. (Id.) Mr. Anson further found that Comcast spent an addition $200,000,000 in advertising and marketing "to promote Xfinity TV that featured or displayed the Fancast Brand, and drove traffic to Fancast.com, either indirectly or though Xfinity and/or Comcast websites." (Id.)

Based on his experience in branding and advertising, Mr. Anson opined that "it will take at least one year's of Comcast['s] average annual advertising expenditures to correct any

---

[14] In addition, "numerous other websites or organizations with names that have no similarity to [f]ancaster were mentioned at greater or equivalent rates as Fancast, including Youtube (22 respondents), Twitter (9), ESPN (8), NFL (7), Yahoo (5), Facebook (5), Google (3) and TMZ (2)." (Poret Decl. [ECF No. 132] ¶ 69.)

inaccurate impressions in the marketplace." (Id.) Mr. Anson thus arrived at a "reasonable estimate" of $73,163,977 owed to Fancaster in corrective advertising expenditures to "rebuild the goodwill that has been destroyed by Comcast." (Id.) Specifically, based on Fancaster's involvement in "broadcasting on low-power networks in stadiums and sporting events, [] covering events of general interest . . . SMS texting and broadcasting via partnerships with several major entities . . . Fancaster had existing goodwill and the potential to build new goodwill but for Comcast's actions." (Id.) However, Mr. Anson testified that the proposed figure of $73,163,977 was based entirely on Comcast's advertising expenditures, and that the fancaster mark's goodwill "doesn't have any bearing on the amount of corrective advertising." See (Sarowitz Decl. [ECF No. 137], Ex. 5.)

Indeed, Mr. Anson foresees a "substantial amount of advertising" to regain this goodwill, including national advertising on television, the Internet, and in print. (Id.) This is so that Fancaster can compete with Comcast's "Fancast/Xfinity behemoth" and "level the playing field." (Id.) To be sure, Mr. Anson assumes that Comcast and Fancaster compete in the same digital media market, which also includes websites like hulu.com and TV.com, and therefore discusses the methods and costs of advertising in that market.

## II.  DISCUSSION

Comcast now moves for summary judgment on all of Fancaster's claims. In doing so, it argues that (1) there is no likelihood of confusion between the FANCAST and fancaster marks, and (2) Fancaster is not entitled to corrective advertising damages.[15] Fancaster moves for summary judgment on Comcast's claims for fraud on the PTO and cyber piracy. In doing so, it argues that (1) there is no evidence of fraudulent intent, and (2) Fancaster's valid trademark

---

[15] Comcast also moves for summary judgment on Fancaster's cyber piracy claim. However, as discussed below, the motion will be denied because Comcast does not adequately address that claim in its motion papers.

registration of the fancaster mark and registering "fancast" doman names before the launch of fancast.com suggests good faith in registering those domain names.

The parties also move to exclude certain evidence from the record.  Specifically, Comcast moves to exclude the testimony of Fancater's damages expert, Weston Anson, arguing that (1) he did not employ a reliable methodology in opining that Fancaster is entitled to corrective advertising damages, (2) he applied that methodology in a speculative manner, (3) his report and testimony do not fit the facts of this case, and (4) permitting him to testify on the damages in this case would be prejudicial to Comcast.  Fancaster moves to exclude the testimony and surveys conducted by Mr. Poret, arguing that he used unreliable methods in conducting the surveys and that those methods do not fit the facts of this case.  Fancaster also moves to exclude the reports and testimony of Comcast's PTO and cyber piracy experts, Gary Krugman and Greg Lastowka, arguing that they usurp the role of the Court in opining on several legal issues in this case.

Finally, Fancaster moves to strike the affirmative defenses of fraud, unclean hands, laches, and acquiescence from the pleadings, arguing that there is no evidence that (1) it unreasonably delayed commencement of this lawsuit; (2) it acquiesced in Comcast's infringement; or (3) Comcast relied upon its actions and has been prejudiced as a result of such reliance.

## A.    Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing

law." Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.  "Failure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception."  Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) (quotations and citation omitted).

**B.      Fancaster's Motions in Limine**

Before dealing with the substantive claims in this case, the Court will first address the two motions in limine submitted by Fancaster in order to properly define the scope of the record for summary judgment.  Fancaster moves to (1) exclude the expert testimony of Hal Poret and the two surveys conducted by him, and (2) exclude the testimony of Gary Krugman and Greg Lastowka.

Rule 702 governs the admissibility of expert testimony.  It allows a qualified individual who possesses "scientific, technical, or other specialized knowledge" to testify as an expert if "it will assist the trier of fact to understand the evidence or to determine a fact in issue."  FRE 702. A witness may be qualified by "knowledge, skill, experience, training, or education."  Id.  The expert may offer his or her opinion on matters outside the scope of his personal knowledge only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  FRE 702.  Put another way, "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  Pineda v. Ford Motor Co., 520 F. 3d 237, 244 (3d Cir. 2008).

The "proponent of expert testimony must establish his expert is qualified and his testimony is admissible by a preponderance of the evidence."  Poust v. Huntleigh Healthcare, 998 F. Supp. 478, 490 (D.N.J. 1998).  The Court has an obligation to act as a "gatekeeper" to ensure the "reliability and relevancy of expert testimony" presented to the finder of fact.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); See also Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592-593 (1993).

To aid in this inquiry, <u>Daubert</u> and <u>United States v. Downing</u>, 753 F. 2d 1224 (3d Cir. 1985), cite several factors for the Court to consider in examining the expert's methodology: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualification of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F. 3d 717, 742 (3d Cir. 1994) <u>citing</u> <u>Daubert</u> and <u>United States v. Downing</u>, 753 F. 2d 1224 (3d Cir. 1985).

### i.    *Motion to Exclude Hal Poret's Surveys and Testimony*

Fancaster argues that the methodologies of the surveys conducted by Mr. Poret are flawed to the point that they and Mr. Poret's testimony relating to those surveys should be excluded from the record.  In the context of survey evidence, "mere technical flaws" in methodology go to "the weight accorded a survey, not its admissibility." <u>Citizens Financial Grp., Inc. v. Citizens Bank of Evans City</u>, 383 F.3d 110, 121 (3d Cir. 2004); <u>see also</u> <u>In Re Paoli</u>, 35 F.3d at 744 ("The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").  However, "fatal flaws" in a survey's methodology merit its exclusion. <u>Citizens Financial Grp.</u>, 383 F.3d at 121; <u>see also</u> <u>In Re Paoli</u>, 35 F.3d at 746 ("The judge should only exclude the evidence of the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.").  Fancaster argues that

Mr. Poret's surveys are "fundamentally flawed in several different ways" that merit their exclusion.  (Pl. Br. [ECF No. 145] 4.)  The Court will address each alleged flaw in turn.

       1.  The Surveys' Universe

Fancaster contends that the surveys' universe was flawed in that it (1) only focused on sports fans, as opposed to sports, movie, and music fans, (2) ignored Fancaster's initial target of 18-35 year old males, and (3) improperly surveyed participants nationwide because Comcast offers its services only in certain markets.  Comcast argues that the surveys properly (1) limited participants to sports fans because Fancaster focuses on sports-related content, (2) included both men and women because both men and women are part of Fancaster's target audience, and (3) included participants nationwide because both fancaster.com and fancast.com are available nationwide and Fancaster targeted consumers nationwide.

A proper survey universe is "'that segment of the population whose perceptions and state of mind are relevant to the issues in the case.'"  Citizens Financial Grp., 383 F.3d at 118-19 (quoting 6 McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2003)).  "'A survey of the wrong universe will be of little probative value in litigation.'"  Id.  The party offering the survey evidence bears the burden of proving that the universe is proper.  Id.

Here, it is undisputed that the likelihood of confusion alleged by Fancaster is "reverse confusion."  In contrast to cases of "forward confusion" where "the new or junior user of the mark will use to its advantage the reputation and good will of the senior user by adopting a similar or identical mark . . . [r]everse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services."  Fisons Horticulture Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 474 (3d Cir. 1994).  In other words, Fancaster's theory of confusion is that

Comcast—a much larger, more powerful company that Fancaster—likely caused confusion as to the source of the fancaster mark and fancaster.com's services as a result of its use of the FANCAST mark.

In a case claiming forward confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services." 6 McCarthy § 32:159 (4th ed. 2011) (emphasis in original). In contrast, "the universe in a reverse confusion case should be limited to the senior user's customer base." Citizens Financial Grp., 383 F.3d at 119 (citing McCarthy § 32:159).

In both the March 2009 and March 2011 surveys, Mr. Poret sampled from a universe of "males and females ages 16 or older who: (a) in the past 3 months have used an internet site to view, post, or discuss sports-related content; and/or (b) in the next 3 months are likely to use an internet site to view, post, or discuss sports related content." (Poret Decl. [ECF No. 132] ¶ 11.) It was entirely appropriate for Mr. Poret to sample from sports fans for the March 2009 survey because Fancaster was focused on sports-related content at that time. Indeed, Fancaster's October 2009 business plan states that "[t]he target market initially will be sports fans." (Dickstein Decl. [ECF No. 130], Ex. 13 at 4.)[16] To be sure, the plan also states that Fancaster planned an "expansion of its offerings to include both music and movie fans at later stages." (Id.) However, this does not affect the validity of the universe chosen for the March 2009 survey because the proper universe was Fancaster's actual—i.e., not intended or future—customer base at that time. See Citizens Financial Grp., 383 F.3d at 119.

It was similarly appropriate for Mr. Poret to sample from sports fans for the March 2011 survey because Fancaster maintained its sports focus up to and beyond that point. As of April

---

[16] Moreover, Fancaster's November 1, 2010 pleadings state that "the content provided on the [fancaster] web site relates to sports, sports fans, broadcasting, and related content and information." (Supp. Compl. [ECF No. 93] ¶ 12.)

21, 2011, the vast majority of video clips and video categories on fancaster.com were sports-related.[17]  See (Dickstein Decl. [ECF No. 130], Ex. 17.)  In addition, as of that same date, the vast majority of the 120 most-viewed videos on the site were sports-related.  See (Dickstein Decl. [ECF No. 165], Ex. 3.)

Fancaster's argument that the surveys improperly sampled from both males and females is also unpersuasive.  While Fancaster's October 2009 business plan states that, "[f]or sports fans, Fancaster intends to focus on the ever-capricious but nonetheless influential demographic of 18-to-35 year old males" (Dickstein Decl. [ECF No. 130], Ex. 13 at 4), as previously discussed, the proper survey universe in the reverse confusion context is Fancaster's actual, not intended, customer base at the time of the survey.[18]  See Citizens Financial Grp., 383 F.3d at 119.  To that effect, Mr. Krueger testified that Fancaster was "targeting [a] younger . . . probably a little male-driven" audience "anywhere from 12 years old to 40 years old . . . although we have a lot of women who love Fancaster."  (Dickstein Decl. [ECF No. 165], Ex. 7.)  Thus, Mr. Poret's sampling of both men and women does not amount to a fatal flaw that merits exclusion of the surveys.

Finally, Fancaster's argument that it was improper for Mr. Poret to sample nationwide because Comcast does not maintain a nationwide footprint is irrelevant because, as previously discussed, the proper survey universe in this case is Fancaster's actual customer base, not

---

[17] As of May 2, 2011, just nineteen of the approximately four hundred videos on fancaster.com were in the "Movies Music and TV" category.  (Dickstein Decl. [ECF No. 165], Ex. 5.)  Of those nineteen, nine were added in March 2011.  (Id.)

[18] Furthermore, in its brief opposing Comcast's Motion for Summary Judgment, Fancaster contends that its "target audience includes sports fans (of all ages and both genders)."  (Pl. Br.[ECF No. 159] 28.)

Comcast's.[19]  See Citizens Financial Grp., 383 F.3d at 119.  Fancaster's damages expert, Weston

Anson, testified that Mr. Krueger told him that Fancaster has a nationwide customer base.  See

(Dickstein Decl. [ECF No. 165], Ex. 8.) ("[M]ost of [Fancaster's] audience comes from the East

Coast, down through the Carolinas, the upper Midwest, including Dakotas and Iowa, Kansas, and

on then the West Coast, California, and I assume perhaps, Washington and Oregon.  That's my

understanding . . .  I believe Mr. Krueger did tell me that, yes.")  Therefore, Mr. Poret's use of

nationwide sampling methods is not a fatal flaw that merits exclusion of the surveys.

### 2.  Use of Non-Probability Mall Intercept Surveys

Fancaster argues that Mr. Poret, in his report, improperly extrapolated the results of both

surveys to the general population.  Specifically, Fancaster contends that Mr. Poret's conclusion

"that there is no likelihood of confusion created by Comcast's use of the FANCAST mark in

connection with the Fancast website" (Poret Decl. [ECF No. 132] ¶ 10) is unfounded because the

results of non-probability surveys, such as the ones used by Mr. Poret, cannot be reliably

extrapolated to the survey universe.  Comcast maintains that this does not merit exclusion

because non-probability surveys have long been held to be admissible evidence in trademark

cases.

Fancaster cites authority from this court stating that non-probability surveys "are weak

evidence of behavior patterns in the test universe."  Prince Mfg., Inc v. Bard Int'l Assoc., No. 88-

3816, 1988 WL 142407, *8 (D.N.J. Dec. 22, 1988) (quoting Am. Home Prods. Corp. v. Barr

Labs, Inc., 656 F. Supp. 1058, 1070 (D.N.J. 1987)); see also Boehringer Ingelheim G.m.b.H v.

Pharmadyne Labs, 532 F. Supp. 1040, 1053 (D.N.J. 1980) ("Because the survey was not a

probability sample, the results cannot be statistically extrapolated to the universe.").  However,

---

[19] However, as discussed below, Comcast's footprint is relevant to whether it was proper to use an Eveready survey in March 2011.

this court has also noted that "[m]all intercept studies have been accepted by this court and others, despite their lack of projectability." Tyco Indus., Inc. v. Lego Sys., Inc., No. 84-3201, 1987 44363, *25 (D.N.J. Aug. 26, 1987); see also Boehringer Ingelheim, 532 F. Supp. at 1053 n. 17 ("[S]urveys can be reliable even if not based on a probability sample."). Thus, the fact that a survey was based on a non-probability sample goes to its weight, not its admissibility.

### 3.   The March 2009 Survey

Fancaster contends that the March 2009 survey was fatally flawed because it "bore no resemblance whatsoever to marketplace conditions, in many respects."[20] (Pl. Br. [ECF No. 145] 18). Professor McCarthy writes: "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 6 McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2011). "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." Troublé v. Wet Seal, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). Indeed, A survey must be "designed to examine the impression presented to the consumer by the accused product. Therefore, [it] must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999). Accordingly, the results of a survey that does not adequately simulate how a consumer would encounter a trademark are neither reliable nor probative.

Fancaster advances several ways in which the March 2009 survey fails to reflect marketplace conditions, only one of which need be addressed by the Court: that Mr. Poret used a

---

[20] Fancaster also argues that the March 2009 survey should be excluded because Mr. Poret used improper controls. The Court need not address this argument because, as discussed below, the March 2009 survey is excluded for failure to adequately replicate marketplace conditions.

printout and static screenshots of the fancast.com fancaster.com homepages instead of live versions of those websites.  Mr. Poret's use of a printout and static screenshots, instead of live websites, provide ample grounds on which to exclude the March 2009 survey.  For one, it is difficult to fathom how presenting a respondent with a paper printout of the FANCAST homepage in anyway replicates how an Internet user would encounter and perceive the FANCAST website in the marketplace.[21]  Websites, particularly those that offer video content, are meant to be viewed on a computer and allow consumers to browse and interact with them via hyperlinks.  The FANCAST printout offered none of these aspects.  Similarly, although viewed on a computer, the static screenshots of the fancaster and control website homepages did not allow respondents to interact with them as they ordinarily would in the marketplace.

Comcast's contends that the printout and static screenshots "provided a representative snapshot of the content available on the sites."  (Def. Br. [ECF No. 166] 19.)  This contention is unavailing.  While an image of a website's homepage may accurately summarize the nature of its content and services, it cannot meaningfully test for confusion if it is not presented in the way that an Internet user would actually encounter it.  See 6 McCarthy § 32:163.  Notably, in his March 2011 survey, Mr. Poret presented respondents with a live version of the fancaster website and allowed them to browse it on a computer, and Comcast presents no reason why it would have been any less appropriate or practicable to do so in the context of the March 2009 survey.  Accordingly, this methodology deprives the March 2009 of reliability and therefore merits its exclusion as well as exclusion of any testimony related thereto.

4.  The March 2011 Survey

---

[21] Additionally, the use of two different media to present the FANCAST and fancaster websites could improperly enhance the distinction between them.

Fancaster argues that it was improper for Mr. Poret to use an Eveready survey in March 2011 because there is no evidence that its respondents had been exposed to the FANCAST mark. Comcast contends that (1) there is ample evidence that FANCAST mark had saturated the marketplace, and (2) any lack of awareness of the FANCAST mark merely cuts against Fancaster's claim of reverse confusion.

"[A] survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case."  4 McCarthy on Trademark and Unfair Competition § 23:10 (4th ed. 2011); see also CIT Group, Inc. v. Citicorp, 20 F. Supp. 2d 775, 792 (D.N.J. 1998) ("It is Professor McCarthy's opinion that surveys . . . [i]n a situation where the junior user [] has not yet commenced massive use of its name and there has been no advertising or promotion of products and services under that name reverse confusion cannot be measured because the triggering event of market place saturation has not yet occurred.").  Thus, market saturation by a junior user is highly probative of exposure to the junior user's mark.  See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 224 (3d Cir. 2000) (money spent on advertising a mark is "clearly relevant" to consumer recognition of that mark.)

The record indicates that Comcast had launched a substantial nationwide advertising campaign for FANCAST in print, television, and online media.  See (Young Decl. [ECF No. 131] ¶ 4-6.)  In addition, in September 2009, Mr. Krueger testified that he believed Fancast.com to be "one of the top websites in the world" based on several "measurement sites that are publicly available on the internet and track the top web sites in the world," and that Comcast had "done a pretty good job of saturating the market."  (Dickstein Decl. [ECF No. 165], Ex. 7.)

Thus, by March 2011, shortly before Comcast dismantled the FANCAST website, Comcast had saturated the market.

Fancaster contends that, despite this market saturation, a substantial segment of respondents to the March 2011 survey had no exposure to FANCAST because they resided outside of Comcast's territorial footprint.  This contention is unavailing because the FANCAST website was available to anyone with an Internet connection, and Comcast was marketing it to consumers both in and outside of its footprint.  See (Young Decl. [ECF No. 131], Ex. 2 at COMCAST00136.)  To be sure, in late 2009, the FANCAST website began offering certain content to Comcast cable subscribers.  However, there is no evidence that Comcast altered its marketing strategy to target only Comcast subscribers or those within its footprint at that time or before the FANCAST website was dismantled altogether.[22]

Finally, Fancaster argues that the March 2011 survey was fatally flawed because Mr. Poret failed to screen for respondents that had actually been exposed to Comcast's Fancast.com advertising campaign.  Fancaster cites no authority suggesting that a survey in a reverse confusion case requires screening for those who have *actually* been exposed to the junior user's mark, nor is the Court aware of any such authority.  Furthermore, this argument fundamentally misconstrues the nature of reverse confusion, which depends on the overall commercial strength of the junior user's mark.  See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 444 (3d Cir. 2000) ("[I]t is the strength of the larger, junior user's mark which results in reverse confusion."); A & H, 237 F.3d at 230 ("[I]f the greater advertising originates

---

[22] In its brief, Fancaster alleges that "much of Comcast's most intensive and expensive marketing efforts have been focused on its cable television subscribers," particularly with respect to "the massive advertising campaign that Comcast launched in early 2010 that was designed to promote the ability of Comcast cable television subscribers to access their cable subscription services over the internet at Fancast.com."  (Pl. Br. [ECF No. 145] 11.)  However, Fancaster fails to cite to any evidence in the record to support this allegation.

from the junior user, reverse confusion is more likely."). As previously discussed, it is the commercial strength of the junior user's mark that gives rise to an inference of exposure to that mark. To argue otherwise, as Comcast points out, is to argue against the theory of reverse confusion itself. Therefore, it was proper for Mr. Poret to use an Eveready survey in March 2011.

In sum, Fancaster's motion to exclude Mr. Poret's surveys and testimony will be granted with respect to the March 2009 survey and testimony relating thereto, but denied with respect to the March 2011 survey and testimony relating thereto.

### ii. *Motion to Exclude Testimony of Mr. Krugman and Mr. Lastowka*

According to Comcast, Mr. Krugman intends to testify regarding the policies, practices and procedures of the PTO, while Mr. Lastowka intends to testify regarding technological issues of Internet functionality and cyber piracy.

It is well established in the Court of Appeals for the Third Circuit (as well as elsewhere) that "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury." United States v. Leo, 941 F. 2d 181, 196 (3d Cir. 1991); see In re: Initial Public Offering Sec. Litig., 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) for a listing of numerous authorities supporting the proposition that "in fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." As will be further discussed below, Mr. Krugman's and Mr. Lastowka's opinions extend far beyond permissible customs and practices and invade not only the province of the Court but also the province of the jury. While an expert may rely upon treatises or other materials which experts in his field rely upon, he may not make factual findings in a case in the guise of an expert opinion.

1.   <u>Mr. Krugman's Report</u>

Mr. Krugman is unquestionably qualified to testify about the relevant practices and procedures of the PTO in reviewing, processing, approving or rejecting applications for federal registration of trademarks at various times from 1988 to the present.  From 1974 until 1982 he held several positions in the PTO and in 1982 he was appointed to the TTAB as an Administrative Trademark Judge.  In 1989, he left government service and continued in the same field of legal practice and authored many publications.  Paragraphs 2-14 of his report set forth his qualifications in detail.

Paragraphs 15-16 of the report detail the materials Mr. Krugman reviewed to familiarize himself with the case.  It must be noted that, although this was a substantial body of material, it was not by any means a review of the totality of the record in the case.

Mr. Krugman sets forth in Paragraphs 20-26 of his report his expected testimony concerning the examination of trademark and service mark applications/opposition proceedings. This information is technical in nature.  The evidence in this case involves proceedings before the PTO, and it would be helpful to the jury to have an overall understanding of the way in which the PTO operates.

Beyond that, however, Mr. Krugman's expert opinion is a usurpation either of the role of the Court or that of the fact finder.  He details some of the provision the Trademark Act, in particular those concerning "use in commerce", citing cases and regulations to support his interpretation of the term.  He moves on to an evaluation of the factual evidence in the case to conclude that:

> Based on the foregoing and based on my review of the materials referred to above, it is my opinion that, as of the August 29, 1988 application filing date, it does not appear that any broadcasting services were being rendered in commerce under the FANCASTER mark and that, therefore, the application should have been rejected as being void ab

initio.  In addition, the specimens in support of the Declaration of Continued Use, being the nature of letterheads and envelopes with only the mark and the name and address of Mr. Krueger, should not have been accepted as evidence of continued use of the mark in connection with broadcasting services.

This goes far beyond what Comcast stated was the subject of Mr. Krugman's opinion – "the policies, practices, and procedures of the United States Patent and Trademark Office."  It is based upon an incomplete record.  It inappropriately usurps the role of the fact finder.  Fancaster raises other objections to Mr. Krugman's Report that need not be addressed.  It is sufficient to grant Fancaster's motion with regard to Mr. Krugman except that a redacted Report containing only Paragraphs 1-17 and 20-26 of the November 18, 2009 Report may be the subject of Krugman's testimony.

### 2.   Mr. Lastowka's Report

Like Mr. Krugman, Mr. Lastowka is unquestionably qualified to testify in the field in which he is asked to give an expert opinion—the technical issues of internet functionality and cyber piracy.  He is a law professor teaching at Rutgers School of Law—Camden, New Jersey.  His specialty is Internet law, property and intellectual property, which, he has taught at eminent universities and about which he has written many books and articles.  In particular, he is well versed in the new fields of cyber squatting and the Anti-Cyber Squatting Consumer Protection Act ("ACPA").  Like Mr. Krugman's opinion, Mr. Lastowka's opinion wanders far from the proper scope of an expert's opinion.

Paragraphs 1-4 and 6-8 set forth the details of his qualifications and the materials he reviewed in preparation for his Report, while Paragraphs 9 and 10 demonstrate with utmost clarity how inappropriate Mr. Lastowka's Report is as an expert opinion:

III.  Summary of Opinion

9.  Based upon the evidence in the various materials I have reviewed, it is my opinion that the Plaintiff, Fancaster, Inc., has registered multiple domain names with a bad faith intent to profit in violation of the ACPA, 15 U.S.C. § 1125(d)(1).

10.  As a result, I believe that Plaintiff should be liable to Defendants, if Defendants so elect, for a remedy of $1,000 to $100,000 per relevant registered domain name, with the amount being fixed pursuant to 15 U.S.C. § 1117(d) as the Court deems just.[23]

Paragraphs 11-14 and 17 describe the origin and development of the system of Internet domain names and the problems created by cyber squatters.  This provides a background for the enactment of the ACPA.  In the present case, there are claims under the ACPA with which the jury will have to deal.  This information in Mr. Lastowka's report will be of assistance to the jury as it deals with these claims.

Paragraphs 15 and 16 contain a discussion of the confused legal situation that existed after domain names came into use and before the ACPA was adopted.  As Mr. Lastowka puts it, "for multiple reasons, traditional trademark law was a poor fit for the special trademark problems presented by domain names."  There is no reason to burden a jury with these problems.  They would only confuse the jurors and provide no assistance as they wrestle with the cyber squatting claims alleged in this case.

The content of the rest of Mr. Lastowka's report is totally inappropriate as the subject of an expert's report to be presented to the fact finder.  From Paragraph 18-30 the report sets forth the author's summary of the statutory requirements to establish a violation of 15 U.S.C. § 1125(d).  They include an analysis of the "safe harbor" provision, 15 U.S.C. § 1125(d)(1)(B)(ii) and the remedies available.  Reference is made to statutory provisions and case law.  A jury should not be receiving instructions on the law from two sources, and however erudite and accurate they may be, Mr. Lastowka's instructions will not be allowed to compete with the Court's instructions.

---

[23] Lastowka's generosity gives the Court at least a modest role.

Paragraphs 31-46 are totally inappropriate for an expert's report.  Entitled "Relevant Facts and Application of the Law," those Paragraphs make findings of fact simply on the incomplete evidence that Mr. Lastowka has reviewed and sets forth his understanding of the law. He purports to offer an expert opinion as to whether Fancaster's registration and use of at least thirty-two "fancast" domains subsequent to Comcast's registration of the domain name "fancast.com" constitutes bad faith intent to profit in violation of the ACPA.  Here, the expert assumes the role of the fact finder and is therefore not performing the role of an expert.

Fancaster's motion with regard to Mr. Lastowka will be granted except that a report containing only Paragraphs 1-4, 6-8, 11-14 and 17 of Mr. Lastowka's report may be the subject of his testimony.

In sum, Fancaster's motion to exclude the testimony of Gary Krugman and Greg Lastowka will be granted except that  Mr. Krugman may testify about the subject matter of Paragraphs 1-17 and 20-26 of his November 18, 2009 report, and  Mr. Lastowka may testify about the subject matter of Paragraphs 1-4, 6-8, 11-14 and 17 of his report.

**C.     Fancaster's Claims for Trademark Infringement**

"The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'"  Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F. 3d 700, 711 (3d Cir. 2004) (quoting 15 U.S.C. § 1114(1)).  Thus, "[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion."  Commerce Nat'l Ins., 214 F.3d at 437 (quoting Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983)).  "A claim of trademark infringement is established when the plaintiff proves that: (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its

goods or services is likely to create confusion concerning the origin of those goods or services." Id. (citation omitted).

Comcast moves for partial summary judgment on the likelihood of confusion element of Fancaster's claim for trademark infringement. Comcast also moves for partial summary judgment on Fancaster's claim for resulting damages. Likelihood of confusion and damages will each be taken in turn.

### i. *Likelihood of Confusion Between FANCAST and fancaster*

Likelihood of confusion exists "when the consumers viewing the defendant's mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." Commerce Nat'l Ins., 214 F.3d at 438-39 (quotations and citations omitted). Indeed, "[t]he relevant inquiry is not whether consumer confusion is a possibility, but whether confusion is likely." Freedom Card Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 470 (3d Cir. 2005). In ascertaining whether there is a likelihood of confusion among two marks, this Circuit has "adopted a non-exhaustive test using [the following] 10 factors that have been come to be known as the 'Lapp factors.'"[24]:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

---

[24] The factors are named for the case in which they were first set forth: Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983).

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Id. at 470-71(quoting Interpace Corp. v. Lapp, Inc., 721 F. 2d 460, 463 (3d Cir. 1983)).

As previously discussed, this Circuit recognizes two distinct theories of trademark confusion: direct confusion and reverse confusion.[25] Id. at 470. A theory of direct confusion involves "a junior user of a mark attempt[ing] to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark." Id. (citation omitted). As a result, "the consuming public may assume that the established, senior user is the source of the junior user's goods." Id. Reverse confusion, on the other hand, "occur[s] when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." Id. at 471 (citation omitted). In other words, "the 'junior' user is junior in time but senior in market dominance or size." Id. Accordingly, "the doctrine of reverse confusion is designed to prevent . . . a larger, more powerful company usurping the business identity of a smaller senior user." Commerce Nat'l Ins., 214 F.3d at 445.

This Circuit applies the Lapp factors notwithstanding whether a plaintiff pursues a theory of direct or reverse confusion. Freedom Card, 432 F. 3d at 472. "However, economic reality and common sense require that some of the Lapp factors be analyzed differently when reverse

_____

[25] This Circuit also recognizes a third theory of trademark confusion known as initial interest confusion, see Checkpoint Sys., at 292, which Fancaster pursues in its motion papers. However, as discussed below, it cannot prevail under that theory.

discrimination is at issue." Id. "Thus, the strength of the parties' marks (Lapp factor (2)), the intent in adopting the marks (factor (5)), and the evidence of actual confusion (factor (6)), are analyzed differently from the method employed in a typical direct confusion case." Id. Here, it is undisputed that Fancaster is pursuing a theory of reverse confusion. Therefore, the Court will apply the Lapp factors according to that theory.

As discussed fully below, the record shows that each Lapp factor weighs in Comcast's favor. Consequently, there is no likelihood of confusion and Fancaster's claims for trademark infringement are dismissed.[26]

### 1. Similarity (Lapp Factor (1))

The "degree of similarity of the marks may be the most important of the ten factors in Lapp." Fisons Horticulture, Inc. v. Vigoro Indus. Inc., 30 F.3d 466, 476 (3d Cir. 1994). However, it is by no means dispositive. Checkpoint Sys., Inc. v. Check Point Software Techs. Inc., 104 F. Supp. 2d 427, 458 (D.N.J. 2000). The marks in this case "are confusingly similar if ordinary consumers would likely conclude that [FANCAST] and [fancaster] share a common source, affiliation, connection or sponsorship." Id. at 477. Indeed, "[t]he marks need not be identical, only confusingly similar." Id. (quotation and citation omitted).

In determining whether two marks are similar enough to be confusing, "[t]he proper test is not side-by-side comparison but whether the labels create the same overall impression when viewed separately." Kos Pharm, Inc. v. Andrx Corp., 369 F.3d 700, 713 (3d Cir. 2004)

---

[26] Fancaster's state-law claims fall on the same analysis. See Pharmacia Corp v. Alcon Labs, Inc., 201 F. Supp. 2d 335, 386 (D.N.J. 2002) ("[T]he test for [New Jersey] common law infringement and unfair competition is identical to the test for federal infringement and unfair competition.") (citation omitted); Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc, 952 F. Supp. 1084, 1091 (D.N.J. 1997) ("N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act [15 U.S.C. 1125]") (citation omitted). Fancaster's unjust enrichment claim must also be dismissed because Fancaster alleges no facts and cites to no evidence to support it.

(quotation and citation omitted).  "Courts should compare the appearance, sound and meaning of the marks in assessing their similarity."  Id.

Here, the appearance, sound, and meaning of the FANCAST and fancaster marks are sufficiently distinct and therefore present minimal risk of confusion.  As presented on fancast.com, the FANCAST mark appears in all black capital letters next to a pastel "expanding universe design."  In contrast, fancaster mark, as presented on fancaster.com, appears in lowercase light-blue lettering and incorporates a pair of headphones turned on their side to take the place of the letter "c".  Indeed, "[t]he use of a design as part of a mark minimizes [] likelihood of confusion."  Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc., 952 F. Supp. 1084, 1096 (D.N.J. 1997) (citation omitted); see also Richards v. Cable New Network, 15 F. Supp. 2d 683, 690-91 (E.D. Pa. 1998) (marks found dissimilar despite use of identical WORLD BEAT tradename, in part, because plaintiff's logo incorporated a "picture of a globe wearing headphones", while defendant's did not).  Moreover, the fancaster mark includes the phrase "welcome to planet fancaster!" in gold lettering.  Finally, the marks appear in two distinct fonts.  Thus, the appearance of the marks weighs heavily in Comcast's favor.

The sound of the marks weighs less heavily in favor of Comcast, although it is somewhat distinct.  While both use the word "fancast", the fancaster mark maintains an extra syllable that, in turn, creates a different ending sound to the marks.  See A & H, 237 F.3d at 217 (although marks "share the term MIRACLE, there are different numbers of syllables, and the last syllable of each is different.").  Moreover, to the extent that confusion is likely among the sound of the marks, such confusion is minimized by the appearance of the Comcast housemark in conjunction with the FANCAST mark on fancast.com.  See id. at 218-19 ("[O]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of

44

the manufacturer." (quotation and citation omitted)).  Specifically, in a 2009 screenshot of

fancast.com, the Comcast mark and logo appear toward the top of the homepage to the right of

the FANCAST mark and at the bottom of the homepage, <u>see</u> (Poret Decl. [ECF No. 132], Appx.

E); in a 2011 screenshot of the site, in the top right hand corner, the consumer is asked if they are

a Comcast customer.  <u>See</u> (Boudett. Decl. [ECF No. 160], Ex. 17.)  This helps clarify for

consumers that only the FANCAST mark is related to Comcast.

      In addition, the marks evoke distinct meanings.  As discussed below with respect to its

strength, the word "fancaster" is a term used to describe a fan acting as a broadcaster.  The

fancaster mark's use of headphones in place of the letter "c" emphasizes this meaning.  The

FANCAST mark, on the other hand, does not evoke any such meaning.[27]

      Citing to <u>CBS Inc. v. Morrow</u>, 708 F.2d 1579 (Fed. Cir. 1983), Fancaster contends that

the verbal portion of the FANCAST and fancaster marks should be given greater weight than

their design because "in a composite mark comprising a design and words, the verbal portion of

the mark is the one most likely to indicate the origin of the goods to which it is affixed."  708

F.2d at 1580-81.  However, subsequent Federal Circuit decisions weigh the aspects of a mark

according to the facts of the particular case.  <u>See</u> <u>Herbko Intern., Inc. v. Kappa Books, Inc.</u>, 308

F.3d 1156, 1165 (Fed. Cir. 2002) (a court, "for rational reasons, may give more or less weight to

a dominant feature of the marks.").  Indeed, in <u>Herbko</u>, the Federal Circuit gave greater weight to

a mark's verbal component than its design because the design did "not convey any distinct or

separate impression apart from the word portion of the mark."  308 F.3d at 1165.

      Here, there is no evidence that consumers put more emphasis on the FANCAST and

fancaster marks' verbal components than their design or meaning and therefore the Court sees no

---

[27] To be sure, the meaning of the FANCAST mark remains unclear.

reason to do so.[28]   Indeed, as previously discussed, the test is whether the marks "create the same overall impression."  Kos, 369 F.3d at 713.  Thus, while there is some similarity between the verbal portions of the FANCAST and fancaster marks, their design, meaning, and Comcast's use of its housemark in conjunction with the FANCAST mark on fancast.com, renders the marks sufficiently distinct so as to minimize any likelihood of confusion.

Finally, Fancaster contends that the fancast.com domain name and other variants registered by Comcast are similar to the fancaster.com domain name and therefore provide "independent bases for Comcast's liability."  (Pl. Br. [ECF No. 159] 14.)  Specifically, according to Fancaster, "Internet users who see the domains on Internet search engines, sponsored advertisements, or elsewhere, will be confused about the relationship between Fancast.com and Fancaster."  (Id. at 16.)

This contention sounds in the theory of initial interest confusion, which is recognized in this Circuit.  See Checkpoint Sys., 269 F.3d at 292 ("[I]nitial interest confusion is actionable under the Lanham Act.").  Initial interest confusion "occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer [may ultimately] realize[] the true identity and origin of the product."  Id. at 294 (quotation and citation omitted).  Thus, it is intended to prevent an infringer from "us[ing] an established mark to create confusion as to a product's source thereby receiving a free ride on the goodwill of the established mark."  Id. at 295 (quotation and citation omitted).  Infringement claims under a theory of initial interest confusion are subject to the Lapp factors.  See id. at 297 ("As with all cases involving the likelihood of confusion under the Lanham Act, courts should employ all the relevant Lapp

---

[28] In CBS, the court gave greater weight to the verbal portion of the subject mark because the evidence showed that "approximately 15% [of the product's] total sales are by mail order, and [the product's] 17-page catalog (of record) displays" the mark a number of times without its design elements.

factors and weigh each factor to determine whether in the totality of the circumstances marketplace confusion is likely.").

The Court of Appeals has held that of particular importance in assessing initial interest confusion are the relatedness of the underlying products and the level of care exercised by consumers in seeking out those products:

> When products are similar, a firm is more likely to benefit from the goodwill of a firm with an established mark. And when consumers do not exercise a high level of care in making their decisions, it is more likely that their initial confusion will result in a benefit to the alleged infringer from the use of the goodwill of the other firm. Conversely, in the absence of these factors, some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis.

Id. at 296-97; see also 4 McCarthy § 25:76 (4th ed. 2011) ("Even if the accused domain name is identical to the senior user's mark, if the goods or services advertised at the Web site are sufficiently distinct from those identified by the mark, there will be no likelihood of confusion.").

As discussed below, there is minimal overlap in the content of the FANCAST and fancaster websites, which weighs against a theory premised on initial interest confusion. In addition, while there is no evidence in the record regarding the level of care exercised by consumers on the Internet searching for video content, "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce becomes commonplace." Network Automation, Inc v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1152 (9th Cir. 2011).

Moreover, the search engine results offered by Fancaster are not probative of initial interest confusion, as "[a]ny internet user is familiar with the confusion one confronts with such a welter of search results, but that confusion is the uncertainty about where to go next, not

necessarily the confusion that is relevant for purposes of trademark law."  Simon Property Grp. L.P. v. mySimon, Inc., 104. F. Supp. 2d 1033, 1044 (S.D. Ins. 2000); see also J.G. Wentworth, S.S.C. L.P. v. Settlement Funding LLC, 06-cv-597, 2007 WL 30115, *7-8 (E.D. Pa. Jan. 4, 2007) (search engine results merely present "the many choices for the potential consumer to investigate.").  Indeed, the confusion one encounters on an Internet search engine is a twenty-first century version of that experienced when searching the phone book.  Therefore, the similarity factor weighs in favor of Comcast.

### 2.   Strength (Lapp Factor (2))

A mark's strength is evaluated by assessing "(1) the [plaintiff's] mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)."  Freedom Card, 432 F. 3d at 472.  The Court will address each.

#### a.   Distinctiveness/Conceptual Strength

"The inquiry into distinctiveness or conceptual strength is the same whether plaintiff is alleging direct or reverse confusion."  Id.  Accordingly, the conceptual strength of the fancaster mark in this case "is measured by classifying the mark in one of [the following] four categories ranging from the strongest to the weakest: (1) arbitrary or fanciful (such as KODAK); (2) suggestive (such as COPPERTONE); (3) descriptive (such as SECURITY CENTER); and (4) generic (such as DIET CHOCOLATE FUDGE SODA)."  Id. (quotation and citation omitted).

"Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods." A & H, 237 F.3d at 221 (quotation and citation omitted).  "Suggestive marks require consumer imagination, thought, or perception to determine what the product is."  Id. at 221-22.

"Descriptive terms forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods." Id. at 222. "Generic marks are those that function as the common descriptive name of a product class." Id.

"In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning."[29] Id. Stronger marks are entitled to greater protection. Freedom Card, 432 F. 3d at 472. However, "[g]eneric marks receive no protection; indeed, they are not trademarks at all." A & H, 237 F.3d at 222.

Comcast argues that the fancaster mark is entitled to narrow protection because it is descriptive. That is, the word fancaster merely describes the mark's services that allow fans to become broadcasters. Fancaster counters that the fancaster mark is entitled to broad protection because it (1) has been incontestable for fifteen years and therefore presumed to be a strong mark; and (2) is a term coined by Mr. Krueger over twenty years ago and therefore should be categorized as a fanciful mark.

Comcast likens the fancaster mark in this case to the MIRACLESUIT mark at issue in A & H. In that case, a swimwear manufacturer that used the mark MIRACLESUIT sued Victoria's Secret for its use of the mark THE MIRACLE BRA in connection with swimwear. See A & H, 237 F.3d at 198. The Court of Appeals found that the MIRACLESUIT mark was, "at best, merely suggestive." In doing so, it noted that "[t]he word 'suit' has many meanings, but 'bathing suit' is a frequent and familiar one" while "[t]he word 'miracle'. . . indicates the effect that the product is supposed to have on the user or wearer . . .[i.e.] a 'miraclesuit' is a suit that works miracles." Id. 223.

---

[29] The Court need not address the issue of secondary meaning in this case because, as discussed below, the fancaster mark's incontestable status renders it valid and protectable as a matter of law.

Fancaster, on the other hand, contends that the fancaster mark is like the TELECHRON mark in Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3d Cir. 1952).  In that case, the plaintiff registered the name 'Telechron' as a trademark for clocks.  Telechron, 198 F.2d at 905.  The Telechron name "was formed by prefixing the Greek root 'chron' with 'tele', itself a combining form of Greek origin.  'Kronos' was the mythological 'God of Time'.  Adverbially, 'tele' signified 'from afar'.  Thus the etymology of the coined word yielded a connotation of 'time from a distance.'"  Id.  The Court of Appeals found Telechron to be "a coined word with a penumbra of suggestion."  Id.  In doing so, it explained that the notion of "time from a distance" was "too imprecise for meaningful description of any article or object of commerce."  Id.

Here, the fancaster mark is even more descriptive than the MIRACLESUIT mark.  The word fancaster is merely combination of the words "fan" and "broadcaster".  While the word "fan" has several definitions, two common ones are (1) "an enthusiastic devotee (as of a sport or a performing art) usually as a spectator," and (2) "an ardent admirer or enthusiast (as of a celebrity or a pursuit)."[30]  The word "caster" is merely a truncation of the word "broadcaster".  Thus, the name fancaster aptly describes its product as pertaining to sports and other fan-related broadcasting videos.  Indeed, Fancaster's October 2009 business plan states that fancaster.com offers content relating to "fans who want to emulate broadcasters."  (Dickstein Decl. [ECF No. 130], Ex. 13 at 4.)  Mr. Krueger testified that the terms "fan" and "broadcasting" relate to all the videos on the site because they "have some interest to the viewer of the clips" and "everyone is speaking into a microphone and being recorded and transmitted throughout the world," and that "Fancaster.com [is] a place that transforms fans into the role of a broadcaster. . . ."  (Id., Ex. 6.)  Moreover, Mr. Anson testified that the term "fancaster" is used in "common parlance" to mean someone that "gives you a play by play of the whole game."  (Id., Ex. 19.)

---

[30] http://www.merriam-webster.com/dictionary/fan (entry 3).

The mere fact that Mr. Krueger used a truncated version of the word broadcaster does not render it arbitrary or fanciful.  See Remington Prods., Inc. v. North Am. Philips Corp., 892 F.2d 1576, 1580 (Fed. Cir. 1990) ("shortening [a term] to [a] more concise, more easily used" form "is still descriptive"); Application of Abco Development Corp., 588 F.2d 811, 815 (C.C.P.A. 1978) (shortened versions of terms may be descriptive because "users of language have a universal habit of shortening full names from haste or laziness or just economy of words."). Indeed, it does not require any stretch of the imagination to see that fancaster.com is a website that offers content related to sports and other fans as broadcasters.[31]

Nor need a term describe each and every aspect of a product in order to be descriptive. See Am. Infrastructure v. Zachry Const. Corp., No. 08-2701, 2010 WL 5464765, *6 (E.D. Pa. Dec. 28, 2010) (requiring that a mark describe a product's services "as a whole", not necessarily all of its services); 2 McCarthy § 11:19 (4th Ed. 2011) ("To be characterized as 'descriptive,' a term must directly give some reasonably accurate or tolerably distinct knowledge of the characteristics of a product.").  Thus, while the name "fancaster" may not perfectly describe the nature of each and every video on fancaster.com, it fairly describes certain distinct characteristics of the overwhelming majority of them—namely, a sports or other type of fan broadcasting via a microphone.

Finally, whether the fancaster mark is incontestable has no bearing on the likelihood of confusion analysis.  See Lone Star Steak & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 935 (4th Cir. 1995) ("[I]nconstability affects the validity of the trademark but does not establish the likelihood of confusion necessary to warrant protection from infringement."); First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc., 896 F. Supp. 456, 461 (E.D. Pa. 1995)

---

[31] Moreover, Comcast offers evidence of a variety of other websites using the term "caster" as a truncated version of "broadcaster".  See (Dickstein Decl. [ECF No. 130], Ex. 21.)

("Incontestability only addresses the first three aspects of an infringement analysis, namely, whether a mark is valid, entitled to protection and owned by a plaintiff.").

Fancaster cites to <u>CSC Holdings, LLC v. Optimum Networks, Inc.</u>, 731 F. Supp. 2d 400, 408 n.3 (D.N.J. 2010) for the proposition that an incontestable mark is "presumed to be a strong one under Lapp factor 2 [strength]." (Pl. Br. [ECF No. 159] 9) (italics omitted). However, that case addressed the sufficiency of trademark infringement allegations to survive a motion to dismiss. <u>CSC Holdings</u>, 731 F. Supp. 2d at 407. In doing so, the Court noted that it must "accept[] plaintiff's allegation that the [subject] mark is registered and incontestable—an allegation that refutes defendants' argument that the mark is not entitled to legal protection, as incontestable marks are, by definition, valid and protectable." <u>Id.</u> at 407-08. Thus, whether a mark is incontestable only goes to whether a plaintiff has established a valid, protectable trademark. The strength of that mark requires subsequent analysis.[32] And under that analysis, the Court finds the fancaster mark to be descriptive.

Even if the Court were to find that the fancaster mark suggestive or fanciful, the mark would be weakened by evidence of its use in connection with a number of different products in the same market. <u>See</u> <u>A & H</u>, 237 F.3d at 222 ("Suggestive or arbitrary marks may, in fact be 'weak' marks, particularly if they are used in connection with a number of different products."); <u>Noasha LLC v. Nordic Grp. of Co.'s, Ltd.</u>, 630 F. Supp. 2d 544, 555 (E.D. Pa. 2009) ("Warbles" game mark found arbitrary or suggest but nonetheless weak because of evidence that marks for other games targeted at the same markets begin with the word "War", including "Warmaster," "Warhammer," "Warlord" and "World of Warcraft."). Like <u>Noasha</u>, Comcast offers several

---

[32] To be sure, the Court of Appeals once mentioned in passing that "incontestability does bear on the strength of a mark," but only so far as to "bear [incontestability] in mind" in assessing the strength of a mark. <u>U.S. Jaycees v. Philadelphia Jaycees</u>, 639 F.2d 134, 138 n.3 (3d Cir. 1981).

websites beginning with the word "fan" that are offer video and other content relating to sports and other fans.[33]  (Dickstein Decl. [ECF No. 130], Ex. 23.)  This further weakens the fancaster mark.

### b.   Commercial Strength

In a reverse confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion."  Commerce Nat'l Ins., 214 F.3d at 444.  Nonetheless, "analysis of the strength of the senior user's mark is relevant" in a reverse confusion case.  Checkpoint Sys., 269 F.3d at 303.  Thus, courts should look to "(1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark."  Freedom Card, 432 F.3d at 472.

Here, it is clear that Comcast has significantly greater commercial strength than Fancaster and engaged in a substantial marketing campaign on behalf of the FANCAST mark.  However, the parties' and marks' relative commercial strength is not sufficient to overcome the conceptual weakness of the fancaster mark, particularly with evidence of other websites geared toward the same market that begin with the word "fan", making it unlikely that consumers would associate websites featuring video content related to sports and other fans with a particular source, regardless of Comcast's commercial strength.  Thus, the strength factor weighs in favor of Comcast.

### 3.   Intent of Comcast in Adopting the FANCAST Mark (Lapp Factor (5))

---

[33] These include fanshotz.com, fanpop.com, fanster.com, fankam.com, fanadu.com, fanspot.com, fanchat.com, and fanvsfanc.com.  In addition, Fancaster's October 2009 business plan states that fancast will compete with "[o]ther fan sites such as www.fannation.com." (Dickstein Decl. [ECF No. 130], Ex. 13 at 18.)

In cases dealing with reverse confusion, the junior user's intent in adopting the subject mark is assessed by looking to whether it "deliberate[ly] inten[ded] to push the senior user out of the market." Freedom Card, 432 F.3d at 479.  "[M]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith."[34] M.D. On-Line, Inc. v. WebMD Corp., No. 05-CV-4081, 2005 WL 2469668, *8 (D.N.J. Oct. 6, 2005) (quotation and citation omitted).

Fancaster contends that "intentionally causing confusion is not required, good faith is no defense, and evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding the likelihood of confusion.'"  (Pl. Br. [ECF No. 159] 18) (quoting Checkpoint, 269 F.3d at 286).  However, the Court of Appeals subsequently clarified that although it "perhaps implied that mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case, we are reluctant to adopt such an interpretation, as it would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement claims." Freedom Card, 432 F.3d at 480; see also A & H, 237 F.3d at 225-26 ("[M]ere intent to copy, without more, is not sufficiently probative of the defendant's *success* in causing confusion to weigh such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.") (emphasis in original).  In addition, the Court had held that a "good faith explanation of the origin of the accused mark contrasts with the situation sometimes suggested in

---

[34] Fancaster cites to Ritz Hotel, Ltd. v. Shen Mfg. Co., No. 05-4370, 2009 WL 1838357, *8 (E.D. Pa. Jun. 25, 2009) for the proposition that evidence that a junior user knew of the senior user's trademark rights "could convince a jury" that the junior user "intended to cause consumer confusion."  (Pl. Br. [ECF No. 159] 19.)  That case found however, that such evidence, "*together with [] other allegations of [] bad faith conduct before the PTO, if substantiated*" could convince a jury of such.  Id. (emphasis added).

other cases adoption of a mark in order to take advantage of the owner's goodwill." Scott Paper

Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1230 (3d Cir. 1978).

Here, it is undisputed that Comcast knew of the fancaster mark before it developed

TheFan or FANCAST.  However, there is no evidence from which a jury could infer that, in

developing the FANCAST mark, Comcast deliberately intended to push Fancaster out of the

market.  Comcast hired a branding agency, which, on June 23, 2006, proposed the name

"FanCast.com."  (Young Decl. [ECF No. 131], Ex. 4.)  The agency then conducted consumer

research, which indicated that "Fancast.com" performed the best overall.  In addition, two

members of the team at Comcast that helped develop the FANCAST name said it was a logical

joinder of "The Fan" and the Comcast name.  See (Dickstein Decl. [ECF No. 130], Exs. 3, 4.)

Finally, Fancaster contends that Comcast had prior notice of its infringement on the

fancaster mark because it received several cease and desist letters from Mr. Krueger regarding its

Fancaster segment on CSNNE.  This contention is a red herring.  The Fancaster segment on

CSNNE is an entirely different product and mark than FANCAST; it is not probative as to

whether Comcast had prior notice that its FANCAST mark was infringing on the fancaster mark.

Moreover, Fancaster withdrew its cease and desist letters and chose not to pursue litigation.

Thus, any objections Mr. Krueger had regarding CSNNE's Fancaster segment are irrelevant.

Comcast has offered a good faith explanation for how it came to use the FANCAST mark.

Accordingly, this factor weighs heavily in Comcast's favor.

     4.  The Relationship of the Services in the Minds of Consumers (Lapp Factor (9))

This factor requires the Court to assess whether the products offered under the

FANCAST and fancaster marks are "similar enough that a consumer could assume they were

offered by the same source."  Kos, 369 F.3d at 723 (quotation and citation omitted).  Indeed,

"[t]his factor focuses on the nature of the *products* themselves, asking whether it would be reasonable for consumers to associate them or see them as related." Id.  The products "need not be identical for this factor to support finding a likelihood of confusion." Id.  "The question is not whether it is possible to distinguish between the products but whether, and to what extent, the products seem related." Id.  Relatedness involves assessing "the near-identity of the products or their similarity of function." Id. (quotation and citation omitted).  "The closer the relationship of the products, . . . the greater the likelihood of confusion." Id. at 722.

There is little relationship between the videos offered on the FANCAST and fancaster websites that would reasonably lead a consumer to believe that they are related.  Fancaster.com focuses on short video clips emphasizing sports-related content, most of which feature a sports fan or athlete speaking into a microphone displaying the fancaster mark to discuss a particular sporting event, sports team, or sports fans in general.  Mr. Krueger testified that a unifying theme of the video clips on fancaster.com, no matter what category it falls under, is that they all involve broadcasting: "[e]veryone is speaking into a microphone and being recorded."  (Dickstein Decl., [ECF No. 130] Ex. 6 at 64.)  Fancast.com, in contrast, focuses on full-length premium mainstream media content over the Internet, including major television network programming, as well as full-length studio movies offered by premium cable channels.

While both sites offer sports-related video content, that fact alone is not a basis on which to conclude that a consumer would reasonably see that content as related.  Indeed, "[g]oods may fall under the same general product category but operate in distinct niches.  When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark.  Checkpoint Sys., 269 F.3d at 287-88; see also Harlem Wizards, 952 F. Supp. At 1095 (finding no product

56

similarity between professional competitive basketball team and "show basketball" team);

Machine Head v. Dewey Global Holdings, Inc., 61 U.S.P.Q.2d 1313, 1318-19 (N.D. Cal. 2001)

("The fact that both products could broadly be described as relating to music is not sufficient to

find that the products have a similar use or function."). Thus, the Court must look to the specific

nature of the sites' content and determine if it overlaps in a manner that would cause confusion

among an ordinary consumer.

Fancaster presents evidence of overlapping content in the form of (1) short video clips on

both sites related to college and professional basketball, some of which are player interviews and

press conferences and expert reactions,[35] see (Boudett Decl. [ECF No. 160], Ex. 31); (2) short

video clips on both sites related to the Westminster Kennel Club Dog Show, see (id., Ex. 46);

and (3) two short video clips (one fifty-five seconds and another two minutes and six seconds) of

interviews regarding Jackie Robinson on fancaster.com, juxtaposed with a one hour and thirteen

minute video clip of "The Jackie Robinson Story" on fancast.com, see (id., Ex. 43.)[36]

In light of the enormous number of videos offered on both sites, and the fact that they

maintain very different emphases, this level of overlap is not significant enough to suggest a

likelihood of confusion. See Primemedia Intertec Corp. v. Tech. Marketing Corp., 35 F. Supp.

---

[35] The professional basketball clips on the FANCAST site are clearly indicated as coming from "CBS Sports NBA" (Boudett Decl. [ECF No. 160], Ex. 31), which minimizes any likelihood that a reasonable consumer would attribute those clips to the fancaster site.

[36] Fancaster offers other evidence to show that both sites contain overlapping content related to sports, celebrities, and niche events. See (Boudett Decl. [ECF No. 160], Exs. 31-42, 44, 45.) However, it does so by juxtaposing screenshots of video clips from fancaster.com relating to such content with screenshots of search engine results indicating that search terms related to the same content appear somewhere on fancast.com. This is not probative evidence of overlap because it would require a jury to speculate as to whether the allegedly overlapping content on fancast.com appears in video form or merely as written word. For example, while fancast.com has a video clip related to Bret Michaels, fancast.com merely has an article about him from the Associated Press. See (id., Ex., 4.)

2d 809, 820 (D. Kan. 1998) ("some overlap" in subject matter among products does indicate a likelihood of confusion unless overlap is "substantial"); Genovese Drug Stores, Inc. v. TGC Stores, Inc., 939 F. Supp. 340, 348 (D.N.J. 1996) (products from drug store and medical device store not related where medical device store "does not sell the majority of items usually sold in a drug store . . . [and] at most there is only a 20% overlap between the products sold by both stores."). Accordingly, this factor weighs in favor of Comcast.

### 5. Sales Efforts and Marketing Channels (Lapp Factor (7))

"[W]hen parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." Checkpoint, 269 F.3d at 289. Here, there is virtually no overlap in the parties' marketing efforts for their respective sites. Comcast marketed FANCAST toward a national audience that consumes mainstream media. (Young Decl. [ECF No. 131] ¶ 4.) Indeed, Comcast's primary target for fancast.com was a mainstream audience of 29-54 year-olds, the majority of which are female.[37] (Id., Ex. 2.) In contrast, Fancaster's initial target audience was male sports fans ages 18-35.[38] (Dickstein Decl. [ECF No. 130], Ex. 13 at 4.) This is evidenced by Fancaster's marketing efforts at sporting events and bars.

The parties also used vastly different marketing channels to promote their sites. To promote FANCAST, Comcast bought advertisements in a variety of national mainstream print

---

[37] To be sure, a 2006 strategy document indicates that Comcast intended to reach a somewhat different secondary audience of 18 to 28 year olds that use sites like YouTube.com, ifilm, myspace.com, feedroom, atomfilms, Jib Jab, MeFeedia.com, and del.icio.us. (Young Decl. [ECF No. 131], Ex. 2). However, there is no evidence that Comcast made any actual efforts to target this audience in the course of its marketing campaign.

[38] Fancaster contends that its "target includes male and female fans not only of sports but of music, movies, Broadway, social issues, politics, and entertainment generally" (Pl. Br. [ECF No. 159] 21) but cites no support in the record to support that contention. Moreover, Mr. Krueger testified that Fancaster was "targeting [a] younger . . . probably a little male-driven" audience "anywhere from 12 years old to 40 years old." (Dickstein Decl. [ECF No. 165], Ex. 7.)

publications and on television channels distributed on Comcasts's cable television system. Fancaster, on the other hand, marketed fancaster on local television channels in Sioux Falls, South Dakota and Sioux City, Iowa, on radio stations in Charleston, South Carolina, and via flyers and handbills.[39]

To be sure, both Comcast and Fancaster marketed their services over the Internet. However, "*some* use of the Internet for marketing does not, in itself, constitute overlapping marketing channels. Rearden LLC v. Rearden Commerce, Inc., 597 F. Supp. 2d 1006, 1024 (C.D. Cal. 2009) (citing Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002)) (emphasis in original). "[T]he proper inquiry relates to whether both parties use the Web as a *substantial* marketing and advertising channel . . . and whether the parties' marketing channels overlap in any other way." Id. (emphasis in original) (quotations omitted). Indeed, "[t]he vast majority of companies today utilize some form of an Internet site and, therefore, this factor alone cannot be determinative." Id.

As previously discussed, the record shows that the parties did not use overlapping marketing channels outside of the Internet. In addition, while Comcast made substantial use of the Internet in marketing FANCAST, Mr. Krueger testified that most of Fancaster's marketing efforts have not been geared toward the Internet. See (Dickstein Decl. [ECF No. 130], Ex. 6 at 194-195.) Moreover, to the extent that Mr. Krueger has marketed Fancaster on the Internet, he has done so on certain sports-oriented websites and those of certain local pubs. (Id. at 195.) Comcast, on the other hand, bought banner ads on Comcast.net and other websites focused on popular TV and movies, such as TVGuide.com, as well as ads on Internet search engines that would appear when users searched for keywords related to the names of specific television

---

[39] Comcast's television ads did not air in these cities.  (Young Decl. [ECF No. 131] ¶ 8.)

shows available on Fancast.com, or terms such as "watch TV shows online."[40]  (Young Decl.

[ECF No. 131] ¶ 4.)  Therefore, these factors weigh in favor of Comcast.

> 6.  <u>Actual Confusion and Length of Time without Actual Confusion (Lapp
> Factors (4) and (6))</u>

A party's failure to come forward with "any competent evidence of actual confusion . . .

weighs significantly against a finding of likelihood of confusion."  <u>Chase Manhattan Bank, USA

N.S. v. Freedom Card, Inc.</u>, 333 F. Supp. 2d 239, 249-50 (D. Del. 2004).  On the other hand,

"[e]vidence of actual confusion is frequently difficult to find."  <u>Sabinsa Corp. v. Creative

Compounds, LLC</u>, 609 F.3d 175, 187 (3d Cir. 2010).  Thus, "actual confusion is not necessary"

to prevail on an infringement claim under the Lanham Act.  <u>Id.</u>

The "most relevant evidence of actual confusion is the testimony of a reasonably prudent

purchaser who was in fact confused by defendant's trademark."  <u>Checkpoint Sys., Inc. v.

Checkpoint Software Techs., Inc.</u>, 104 F. Supp. 2d 427, 464 (D.N.J. 2000) (internal quotations

omitted).  Here, there is no evidence of actual confusion in the three years and two months of the

FANCAST website's existence.  Fancaster maintains that one instance of confusion occurred

when Tom Matthews, a former business partner of Mr. Krueger's believed that fancaster was

related to Comcast.  However, Mr. Matthews (1) did not provide a reason for why he believed

that fancaster was related to Comcast; (2) had never been to fancaster.com; and (3) gave no

indication that he was familiar with FANCAST.  <u>See</u> (Boudett. Decl. [ECF No. 160], Ex. 1 at

168.)  This peculiar instance is not a basis on which to weigh this factor in favor of Fancaster.

<u>See</u> <u>McNeill Nutritionals, LLC v. Heartland Sweeteners, LLC</u>, 511 F.3d 350, 366 (3d Cir. 2007)

---

[40] The evidence offered by Fancaster that both websites were marketed on YouTube, Facebook and Twitter is unavailing.  The evidence does not indicate that the FANCAST branded videos on YouTube in the record were even posted by or with the permission of Comcast.  <u>See</u> (Boudett Decl. ECF No. 160], Ex. 47.)  In addition, The FANCAST page on Facebook advertises for "Xfinity" and directs visitors not to www.fancast.com but to www.xfinityTV.com.  <u>See</u> (<u>id.</u>, Ex. 50.)  Finally, the FANCAST Twitter page is merely a trivia site.  <u>See</u> (<u>id.</u>, Ex. 52.)

("a district court may weigh the sixth <u>Lapp</u> factor in favor of a defendant when it concludes that the evidence of actual confusion was isolated and idiosyncratic" (quotations and citations omitted)).

Nor are several videos that Fancaster offers as evidence of actual confusion, which are even less probative than Mr. Krueger's conversation with Mr. Matthews.  Those videos show people holding a microphone featuring the fancaster mark, many of whom are being prompted to say, "You're watching fancaster dot com"; however, they instead say things like "You're watching fancast dot com," "It's Comcastic tonight," "Thanks for watching Fancast?", and "I'm here with fancast dot com."  (Boudett Decl. [ECF No. 160], Ex. 7 at Fancaster006334-006338, 006591.)  There is no indication in the record of (1) the source of these videos; (2) who the subjects in the video are and under what circumstances they were being videotaped; and (3) whether they had ever visited fancaster.com or fancast.com.[41]  Counsel to Fancaster merely certifies that these videos are "a true and accurate copy of video clips Bates numbered Fancaster 006334-006338 and Fancaster 006591."[42]  (<u>Id.</u> ¶ 7.)  Consequently, these videos fail to provide a basis on which to infer actual confusion.[43]  <u>See</u> <u>Componentone, L.C.C. v. Componentart, Inc.</u>, No. 05-1122, 2008 WL 4790661, *20 (W.D. Pa. Oct. 27, 2008) (failure to provide affidavits or testimony from the authors of evidence of actual confusion deprives courts of "context for evaluating whether" such evidence is "the result of confusion between the parties' marks" and

---

[41] Notably, immediately upon production of these videos, counsel for Comcast requested relevant information about them.  (Dickstein Supp. Decl. [ECF No. 130], Ex. 39.)  There is no indication that Fancaster provided any of the requested information.

[42] Fancaster also submits a declaration, dated May 5 2011, from a Bill Cote merely indicating that Mr. Cote was the videographer in one of the videos, which was shot on or around January 1, 2011.  <u>See</u> (Boudett Decl. [ECF No. 160], Ex. 8.)

[43] In addition, there is insufficient evidence by which to authenticate them.  <u>See</u> FRE 901(a).

does not "create a genuine issue of material fact as to actual confusion."). Indeed, "[c]onfusion resulting from the consuming public's carelessness, indifference, or ennui will not suffice." A1 Mortg. Corp. v. A1 Mortg. and Financial Servs., LLC, No. 03-CV-2002, 2006 WL 1437744, *8 (W.D. Pa. Mar. 16, 2006); see also Instant Media, Inc. v. Microsoft Corp., 2007 WL 2318948, *14 (N.D. Cal. Aug. 13, 2007) ("[C]onfusion in the abstract is not actual confusion.").

Finally, the results of Mr. Poret's March 2011 survey weigh against finding a likelihood of confusion, with just two of two hundred and nine respondents "indicating possible confusion with Comcast or Fancast in response to any survey question." (Poret Decl. [ECF No. 132] ¶ 67); see also McNeill Nutritionals, 511 F.3d at 366 ("Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*."). Consequently, this factor weighs heavily in favor of Comcast.

### ii.   *Damages*

Fancaster seeks damages in the form of corrective advertising expenditures to remedy Comcast's alleged infringement on the fancaster mark. Corrective advertising is a recognized theory of damages in trademark infringement cases. See, e.g., Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 506 (7th Cir. 1992); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374-76 (10th Cir. 1977). "Corrective advertising is a method of repair. Defendant diminishes the value of plaintiff's trademark, and advertising restores that mark to its original value." Zazu, 979 F.2d at 506.

To prevail on a theory of corrective advertising, a Fancaster must show that (1) "the confusion caused by the defendant's mark injured the plaintiff" and (2) that 'repair' of the old trademark, rather than adoption of a new one, is the least expensive way to proceed." Id.; see also A & H Sportswear Co. v. Victoria's Secret Stores, Inc., 167 F. Supp. 2d 770, 801-02 (E.D.

Pa. 2001) (failure to show "any sizable damages" or "reckless disregard for plaintiff's rights" precludes an award of corrective advertising damages); <u>Juicy Couture, Inc. v. L'Oreal USA, Inc.</u>, No. 04-7203, 2006 WL 1359955, *2 (S.D.N.Y. May 18, 2006) (failure to show lost profits, lost sales, or damage to reputation precludes award of corrective advertising).

There is not a shred of evidence of any damage to the fancaster mark caused by Comcast. The only loss to Fancaster that Mr. Krueger could testify to was that resulting from pursuing the instant litigation against Comcast.  <u>See</u> (Sarowitz Decl. [ECF No. 137], Ex. 1.)  Mr. Anson was also unable to testify to any pecuniary loss, as he was retained by Fancaster only to calculate an appropriate corrective advertising award based on Comcast's advertising expenditures.  <u>See</u> (<u>id.</u>, Ex. 5.)  While Mr. Anson stated that Comcast's actions resulted in a loss of "goodwill" to the fancaster mark, he admits that his proposed corrective advertising award has no relation to any damages to the mark.  <u>See</u> (<u>id.</u>)

Fancaster argues that it need show none of this to be entitled to corrective advertising damages.  In doing so, it relies heavily on the Tenth Circuit's decision in <u>Big O Tire</u>.  In that case, the plaintiff "presented more than a dozen witnesses who testified to actual confusion" and two of the defendant's executives "testified confusion was likely or even inevitable."  <u>Big O</u>, 561 F.2d at 1372.  There is no such evidence of actual confusion or blatant infringement in this case. Accordingly, Fancaster's claim for corrective advertising damages is dismissed.[44]

**D.    Fancaster's Cyber Piracy Claim**

Comcast's notice of motion petitions the Court for summary judgment on all counts of Fancaster's complaint.  However, Comcast did not address Fancaster's cyber piracy count in its

---

[44] This renders moot Comcast's Motion in Limine to Exclude the Testimony of Weston Anson.

opening brief.[45]  While Concamst inserts a conclusory paragraph concerning the claim in its

reply brief (Def. Reply Br. [ECF No. 167] 15), this is insufficient and frankly improper.

Under Federal Rule of Civil Procedure 56(c) it is Comcast's obligation to support its

assertions that no disputed fact issues exist with respect to each claim "by (A) citing to particular

parts of materials in the record . . . or (B) showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  Moreover, the rules of basic fairness and professionalism require

that a moving party give the opposition the opportunity to fully and fairly respond to its

arguments.  It would be unreasonable to permit Comcast to place the entirety of its

argumentation in the reply brief and thereby deny Fancaster the ability to meaningfully respond.

Accordingly, Comcast's Motion for Summary Judgment on Fancaster's cyber piracy claim is

denied without prejudice.

## E.    Comcast's Counterclaims

Fancaster seeks summary judgment on Counts One, Two, and Four of Comcast's

Counterclaims against Fancaster and Craig Krueger alleging: (1) fraud on the Patent and

Trademark Office in violation of 15 U.S.C. § 1120; (2) declaratory judgment of cancellation; and

(4) cyber piracy in violation of 15 U.S.C. § 1125(d), respectively.  The Court will address each

claim in turn.

### i.    *Fraud on the Patent and Trademark Office (15 U.S.C. § 1120)*

15 U.S.C. § 1120 provides a cause of action against "[a]ny person who shall procure

registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or

---

[45] Indeed, the only reference to cyber piracy in the entire brief is a parenthetical description of a case suggesting that "many of the Lapp Factors are also appropriate indicia of confusingly similar marks in the context of domain names."  (Def. Br. [ECF No. 127] 17-18).

representation" by "any person injured thereby. . . ."  To prevail on a claim arising under this

section, a plaintiff must show by clear and convincing evidence:

> 1. A false representation regarding a material fact.
>
> 2. The person making the representation knew or should have known that the representation was false ("scienter").
>
> 3. An intention to induce the listener to act or refrain from acting in reliance on the misrepresentation.
>
> 4. Reasonable reliance on the misrepresentation.
>
> 5. Damage proximately resulting from such reliance.

Patsy's Italian Restaurant, Inc. v. Banas, 658 F.3d 254, 270-01 (2d Cir. 2011) citing In re Bose,

580 F.3d 1240, 1243 (Fed. Cir. 2009); Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th

Cir. 2006); United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1226 (10th Cir.

2000).[46]

Comcast alleges that it has suffered from two intentionally false statements made by Mr.

Krueger to the PTO.  The purported false statements are as follows.  First, Comcast claims that

Mr. Kruger "submitted a declaration dated July 19, 1988, in which he swore under oath that he

'has adopted and is using the trademark shown in the accompanying drawing for the following

goods: communications' and/or 'broadcasting services,' and that '[t]he trademark was first used

on the goods in Interstate commerce on July 15, 1988; and is now in use in such commerce.'"

(Perry Cert. [ECF No. 138] ¶ 2.)  Second, Comcast states that on September 8, 1994, Mr.

Krueger submitted an affidavit with the PTO, in which he swore that "he was using the mark in

commerce in connection with the broadcasting services that were stated in the registration, and

had been doing so for five consecutive years."  (Id. at ¶ 14.)

---

[46] See also 6 McCarthy § 31:61 (4th ed. 2008).

Comcast claims that neither statement is correct because contemporaneous evidence demonstrates that the "uses" to which Mr. Krueger had put the Fancaster mark were either "mere preparation," "demonstrations," "testing," or "marketing presentations" and thereby do not qualify as genuine "use in interstate commerce." (Def. Br. [ECF No. 149] 17, 20). This is a tenuous position. Under law at the time of Mr. Krueger's trademark application, the registrant of a trademark need only have made a single "token use" of the mark in commerce.[47] Further, Mr. Krueger has introduced evidence that he had performed significant commercial and promotional actions in connection with the mark, both before and after the registration. To prevail on its claim, Comcast must demonstrate by clear and convincing evidence that none of the preregistration uses of the Fancaster mark constituted even a "token use" in interstate commerce and that Mr. Krueger "knew or should have known" that these uses would not qualify.

Mr. Krueger's proffered preregistration uses include, *inter alia*, a February 1987 play-by-play broadcast using the Fancaster mark to observers of a motorcycle race (Perry Cert. [ECF No. 138], Ex. 4, 524:20-526:8); broadcasts in 1987 to observers equipped with Fancaster branded receivers at football games in Sioux City, IA, Worthington, MN, and the University of Kansas (id. at 526:15-25); a weather broadcast from a hot air balloon in the spring of 1988 (id. at 261:22-264:12); the sale of Fancaster branded radios in July of 1988 (id. at 240:9-23); and the transmission of a prerecorded program to individuals using Fancaster branded radios at Lake

---

[47] This was changed by the Trademark Law Revision Act of 1988, which "revised" the statute "to provide that 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Lucent Information Management, Inc. v. Lucent Technologies, Inc., 186 F.3d 311, 314 (3d Cir. 1999). This language "was intended to eliminate 'token uses,' which occurred when applicants used marks in conjunction with selling goods or offering services for the sole purpose of obtaining registration, and with no intention of legitimately using the mark in commerce until a later date" since "[b]efore 1989, a 'token use' was sufficient to satisfy the use requirement and qualify a mark for registration." Aycock Engineering, Inc. v. Airflite, Inc., 560 F.3d 1350, 1357 (Fed. Cir. 2009) (internal citations omitted).

Okoboji, IA (id. at 527:18-528:21).  After submitting the July 19, 1988 affidavit, Mr. Krueger

continued to conduct activities involving the mark, including: selling Fancaster branded radios

(id., Exs., 14, 21, 22); conducting live demonstrations of the Fancaster broadcast services (id.,

Exs., 13, 16, 19); and producing karaoke shows under the Fancaster mark (id., Ex. 4, 694:21-

296:23).

Comcast has advanced various arguments concerning each of Mr. Krueger's uses of the

Fancaster mark, some legal and some involving factual disputes.[48]  However the Court need not

address the legal significance of each specific use.  It is undisputed that Mr. Krueger engaged in

significant commercial and promotional activity involving the Fancaster mark over the course of

many years.  These activities occurred both before and after Mr. Krueger delivered his sworn

statements to the PTO.  Some of these activities were purely demonstrative, but others involved

the sale of goods for revenue across state lines.  Even if Comcast could show that none of the

activities conducted by Mr. Krueger technically constituted use of the mark in interstate

commerce, either because they were mere demonstrations, or involved sales of products other

than broadcast services or communication, it has offered no evidence from which a jury may

conclude that Mr. Kreuger "knew or should have known" that his statements to the PTO were

incorrect.  A lay businessman who spends years of his life selling branded radios, performing

branded broadcasts, and vigorously promoting additional businesses under a given mark would

_____

[48] As a general matter, Comcast argues that each and every broadcast made to Fancaster
receivers or using the Fancaster mark was a "demonstration," "marketing presentation," or "test"
that does not constitute a use for trademark registration purposes.  (Def. Br. [ECF No. 149] 20).
Comcast further argues that the sales of Fancaster branded radio units do not constitute
"services" and cannot qualify as a use in commerce.  (Id. at 21-22.)  Finally, Comcast argues that
the numerous Fancaster karaoke shows constitute "recordings" rather than "broadcasting
services" and are not covered by the registration.  (Id. at 22.)

have no obvious reason to suspect that his significant efforts do not constitute "use in commerce."

Indeed, Comcast points to only one exhibit as evidence of Mr. Kreuger's intent to deceive.  Comcast submits that the blank letterhead and envelopes that Mr. Kreuger provided in connection with Fancaster's September 8, 1994 Combined Affidavit of Use and Incontestability were "knowingly . . . insufficient" evidence of continuous use since the original 1989 registration.  (Def. Br. [ECF No. 149] 23).  Comcast notes that Mr. Krueger had been told that letterhead was insufficient in previous communications with the PTO, and argues that any subsequent submission of blank letterhead is sufficient for a jury to "permissibly infer" that "Plaintiff's intent was fraudulent."  Id.

This evidence proves nothing.  First, even if the submission was "knowingly . . . insufficient" evidence of use, that alone does not demonstrate knowledge that the underlying statements concerning use were false.  A person may know that he or she submitted insufficient proof of a proposition without knowing that the proposition is actually false.  Second, Comcast's claim is belied by the fact that the blank letterhead and envelopes were accepted by the PTO as proof of continuous use.  Comcast's real complaint is not with Mr. Krueger's submission to the PTO, but with the PTO's decision to accept the—undeniably flimsy—evidence in approving the incontestability application.  There is no suggestion that the letterhead was deliberately misleading or that Mr. Krueger was not genuinely engaged in efforts to market services using the Fancaster mark, albeit with limited success. [49]  While Mr. Krueger's submission of an inadequate

---

[49] In addition to the sales and demonstrations previous described, the record is also replete with evidence of Mr. Krueger's ongoing marketing efforts concerning the Fancaster mark.  Mr. Krueger has introduced letters directed: to Major League Baseball (Perry Cert. [ECF No. 138], Ex. 23); Market Square Arena of Indianapolis (id., Ex. 24), Yosemite Park (id., Ex. 25), The Borckum Company (id., Ex. 26), Hardees Restaurant (id., Ex. 27), Sandeigo Wild Animal Park (id., Ex. 28), the Miami Heat (id., Ex. 29), WNEW Radio of New York City (id., Ex. 30), the

exhibit to the PTO might have been careless or put its application in jeopardy, it cannot, without more, serve as "clear and convincing evidence" of scienter.

Comcast has not provided "a sufficient evidentiary basis on which a reasonable jury could find for [it]" with respect to fraudulent intent.  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006).  Summary judgment on Comcast's first counterclaim is thereby proper.

### ii.   *Declaratory Judgment of Cancellation*

Comcast's second counterclaim is styled as a declaratory judgment of invalidity, but is essentially a restatement of its first and third counterclaims, alleging that the Fancaster mark is invalid due to fraud on the PTO and/or abandonment.  For the reasons stated above, to the extent that this claim is based upon allegations of fraud on the PTO, there is insufficient evidentiary basis to permit it to proceed to trial.  To the extent that it is based upon allegations of abandonment, it is duplicative of Comcast's third counterclaim and impermissible.  Accordingly, Comcast's Second Counterclaim is dismissed.

### iii.   *Cyber Piracy (15 U.S.C. § 1125(d))*

Cyber piracy, frequently known as "cybersquatting," is "a relatively new addition to the Lanham Act" that "prohibits registering a domain name that is confusingly similar to a distinctive mark or dilutive of a famous mark with 'a bad faith intent to profit' from it."

---

United States Tennis Association (<u>id.</u>, Ex. 31), KRXY Radio of Denver (<u>id.</u>, Ex. 32), the Miami Dolphins (<u>id.</u>, Exs., 33, 34), the Minnesota Twins (<u>id.</u>, Ex. 35), and Creighton University (<u>id.</u>, Ex. 36) in which Mr. Kreuger sought to solicit business under the Fancaster mark.  While mere solicitation may not be sufficient to constitute a use in commerce, these letters demonstrate that Mr. Kreuger was actively engaged in efforts to build the Fancaster brand and had every cause to believe that it was "using" the mark in commerce, even if its specific uses are subject to challenge on technical grounds.

Green v. Fornario, 486 F.3d 100, 105 (3d Cir. 2007).[50]  The prohibition was added to prevent unscrupulous parties from registering domain names that were similar to protected marks in the hope of siphoning off related business or extracting a financial payout from the mark's owner. To prevail on a §1125(d) claim, a plaintiff must prove that "(1) [plaintiff's mark] is a distinctive or famous mark entitled to protection; (2) [defendant's] domain names are 'identical or confusingly similar to' [plaintiff's] mark; and (3) [defendant] registered the domain names with the bad faith intent to profit from them."  Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).

As described above, the inherent distinctiveness of a mark is a function of the category into which it falls, and—in the case of descriptive terms—whether the mark has acquired secondary significance in the marketplace.  E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 192 (3d Cir. 2008).  A designation's level of inherent distinctiveness is a question usually left for the fact-finder.  Id. at 192 ("Whether [a mark] is generic or descriptive, and whether that term has acquired secondary meaning, are questions of fact."); see also A.J. Canfield Co. v. Honickman, 808 F.2d 291, 308 (3d Cir. 1986) ("Courts of Appeals have generally held that a designation's level of inherent distinctiveness is a question of fact."). As such, Fancaster's motion must be denied unless it can show the absence of "a sufficient evidentiary basis on which a reasonable jury could find for [Comcast]" on the factual questions. Kaucher, 455 F.3d at 423.

Additionally, a mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(1).  In determining whether a mark possesses the requisite degree of recognition, the Lanham Act directs the court to consider all relevant factors, including:

---

[50] Prohibitions against cybersquatting were added to the Lanham Act by the Anticybersquatting Consumer Protection Act ("ACPA") Pub. L. No. 106–113, 113 Stat. 1501 (1999).

      (i)      The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

      (ii)     The amount, volume, and geographic extent of sales of goods or services offered under the mark.

      (iii)    The extent of actual recognition of the mark.

Id.

Fancaster and Mr. Krueger have advanced no argument that the FANCAST mark is "generic" or lacks intrinsic distinctiveness. Indeed, Mr. Krueger has outright admitted at deposition that the FANCAST mark "may be distinctive." (Sarowitz Decl. [ECF No. 151], Ex. 7 at 390:6-23). In addition, the significant monies spent by Comcast in advertising the FANCAST service are not disputed; indeed, they form the basis for much of Fancaster's previously discussed theory of reverse confusion. Whether FANCAST is a pure neologism or a descriptive portmanteau, there is ample evidence of "distinctiveness" and "fame" to send the issue to a jury.

On the second element, there can be no real dispute. Mr. Krueger has registered dozens of websites bearing containing the word "fancast."[51] These websites differ from the "official" fancast.com only in their extensions. Courts generally ignore extensions like ".com" or ".org" when evaluating whether domain names are identical for the purposes of ACPA. Virtual Works, Inc. v. Volkswagen of America, Inc., 238 F.3d 264, 271 (4th Cir. 2001) ("Because all domain names include one of these extensions, the distinction between a domain name ending with '.com' and the same name ending with '.net' is not highly significant") quoting Shade's Landing, Inc. v. Williams, 76 F.Supp.2d 983, 990 (D. Minn.1999)); see also Coca-Cola Co. v. Purdy, 382

---

[51] These websites include: fancast.co.uk, fancast.org, fancast.us, fancast.eu, fancast.bz, fancast.cc, fancast.com, fancast.gs, fancast.ms, fancast.name, fancast.tc, fancast.tw, fancast.vg, fancast.ws, fancast.au, fancast.com.au, fancast.mobi, fancast.net.au, fancast.nz, fancast.jp, fancast.la, fancast.br.com, fancast.kr.com, fancast.qc.com, fancast.za.com, fancast.es, fancast.eu.com, fancst.gb.com, fancast.uk.com, fancast.us.com, fancast.am, fancastfm, facast.pro, fancast.tel, fancast.cm, fancast.me, and fancast.co.nz.

F.3d 774, 783-4 (8th Cir. 2004) ("Because all domain names end with a top level domain suffix like .com or .org, and domain registrars no longer enforce distinctions between the types of entities that may register names with these extensions, courts generally look to the second level domain name to determine whether it is identical or confusingly similar to a given mark."). Thus, Comcast has satisfied the second element of ACPA.

15 U.S.C. § 1125(d) provides nine non-exclusive factors to guide the court in determining whether the third element—bad faith intent—has been satisfied.  These factors include:

(I)     the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)     the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous

marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C.A. § 1125(d)(1)(B)(i)

As a threshold matter, it would appear that several of these factors weigh in favor of bad faith. The domains in question bear unambiguously identical names to that of a heavily promoted commercial website that belongs to Comcast.  Mr. Krueger and Fancaster had no prior registration of the FANCAST trademark and has never offered products bearing that mark. (Sarowitz Decl. [ECF No. 151], Ex. 7, 211:22-213-22).  Nor have Mr. Krueger or Fancaster actually conducted any business on the suspect domains.  (Id., Ex. 19).  Instead they have used them to divert traffic to fancaster.com or displayed "parked website" advertising pages.  (Id.) This is a common tactic associated with cybersquatting.  See Shields, 254 F.3d at 484 ("A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are misspellings of distinctive or famous names, causing an Internet user who makes a slight spelling or typing error to reach an unintended site" and "is a classic example of a specific practice the ACPA was designed to prohibit.").

Fancaster and Mr. Krueger advance two related arguments as to why, in spite of this evidence, Comcast cannot demonstrate "bad faith intent."  First, they argues that it is subject to the "safe harbor" under 15 U.S.C. § 1125(d)(1)(B)(ii). (Def. Br. [ECF No. 138] 27-28).  That provision provides:

Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

Fancaster and Mr. Krueger contend that their valid trademark registration for the Fancaster mark is proof that they had an objectively reasonable belief that its registration of the various Fancast domain names was a "fair use" or "otherwise lawful" action. (Def. Br. [ECF No. 138] 27-28). Second, they claim that their registration of various "fancast" websites before the fancast.com website was active precludes any finding that subsequent registration violated ACPA. (Id.)

These contentions are highly disingenuous. Comcast purchased the fancast.com domain name and filed an application with the PTO to conduct business using the FANCAST mark in August of 2006. (Perry Cert. [ECF No. 138], Ex. 68); (Sarowitz Decl. [ECF No. 151], Ex. 9). Mr. Krueger began registering large numbers of "fancast" domains almost immediately thereafter, in September of 2006. (Perry Cert. [ECF No. 138], Ex. 70). While the FANCAST website was not officially launched for public use until later, Mr. Krueger does not actually claim that he was unaware of Comcast's purchase, registration, or plans to use the fancast.com domain name to heavily promote services sold under the FANCAST mark. Indeed, he explicitly withdrew prior statements to that effect. ([ECF No.138-10] ¶¶ 72, 81); ([ECF No. 143] ¶¶ 72, 81).

Mr. Krueger's timing and unwillingness to categorically deny knowledge of Comcast's plans heavily influenced its decision to purchase the "fancast" domains is itself highly suggestive of intent. In combination with the evidence that Mr. Krueger has engaged in conduct generally associated with bad faith cybersquatting, there is ample support to send this question to a jury. Consequently, Comcast's Fourth Counterclaim remains.

**F.    Comcast's Affirmative Defenses**

Fancaster seeks to strike two[52] of Comcast's affirmative defenses: laches and

acquiescence.  Federal Rule of Civil Procedure 12(f) provides that "[t]he Court may strike from a

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous

matter."  Courts have broad discretion in resolving motions to strike.  Hanover Ins. Co. v. Ryan,

619 F.Supp.2d 127, 132 (E.D. Pa. 2007) (citing Cipollon v. Liggett Group, Inc., 789 F.2d 181,

185 (3d. Cir. 1986)).  "The purpose of a motion to strike is to simplify the pleadings and save

time and expense by excising from [the pleading] any redundant, immaterial, impertinent, or

scandalous matter which will not have any possible bearing on the outcome of the litigation."

Receivables Purchasing Co., Inc. v. Engineering and Professional Services, Inc., 2010 WL

3488135, *2 (D.N.J. Aug. 30, 2010) (quoting Garlanger v. Verbeke, 223 F.Supp.2d 596, 609

(D.N.J. 2002)).

Since only Fancaster's 15 U.S.C. § 1125(d) claim remains viable, the remaining defenses

will be analyzed with respect to that cause of action.  Laches is an equitable doctrine that "bars

an action only when the delay in bringing the action both caused prejudice and was inexcusable."

Cyberworld Enterprise Technologies, Inc. v. Napolitano, 602 F.3d 189, 200 (3d Cir. 2010).  In

contrast, acquiescence "applies when the trademark owner, by affirmative word or deed, conveys

its implied consent to another."  Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143

F.3d 800, 804 (3d Cir. 1998).  Both doctrines require a showing that Comcast acted in reliance

upon its belief that Fancaster would not enforce its rights and would be prejudiced if Fancaster

were permitted to advance a claim.  University of Pittsburgh v. Champion Products Inc., 686

F.2d 1040, 1045 (3d Cir. 1982) ("The distinction between . . . mere delay and the laches which

give rise to affirmative rights in the defendant as a result of detrimental reliance, has been

---

[52] Comcast's briefing offers no support for its affirmative defenses of fraud and unclean
hands.  Consequently Fancaster's motion is deemed unopposed and the defenses are stricken.

consistently recognized by the Supreme Court for well over 100 years."); <u>Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.</u>, 621 F.3d 981, 990 (9th Cir. 2010) ("in the case of laches, undue prejudice requires at least some reliance on the absence of a lawsuit. Relatedly, prejudice in the context of acquiescence inherently must involve reliance on the senior user's affirmative act or deed, and such reliance must be reasonable.").

Fancaster argues that Comcast cannot demonstrate: (1) that it unreasonably delayed commencement of this lawsuit; (2) that it acquiesced in Comcast's infringement; or (3) that Comcast relied upon its actions and would be prejudiced by permitting suit.  (Pl. Br. [ECF No. 138] 33-34.)  Comcast contends that: (1) Fancaster waited fourteen months before filing suit; (2) a jury may "infer" that Fancaster acquiesced in Comcast's use of FANCAST based on its November 22, 2006 letter approving use of CSNNE's Fancaster segment; and (3) that Comcast suffered "business uncertainty arising from the pendency of this lawsuit."  (Def. Br. [ECF No. 149] 30.)  Comcast further argues that Fancaster "cannot seriously claim that the threat of this lawsuit, in which it seeks a substantial damages award, is not, as a matter of law, prejudicial." (<u>Id</u>.)

The Court need not address whether Fancaster unreasonably delayed bringing suit or implicitly acquiesced in Comcast's alleged infringement.  Comcast has offered no evidence of reliance upon Fancaster's conduct—either its November 22, 2006 letter, or its lengthy delay in bringing suit.  Whether a hypothetical business entity might rely upon a letter or suffer economic harm as the result of a pending lawsuit is irrelevant.  Comcast must produce evidence demonstrating that it reasonably relied upon Fancaster's conduct in taking actions that give rise to its infringement claims.  Absent that reliance, there can be no prejudice to permitting

Fancaster to enforce its claims and no basis for a defense of laches or acquiescence. The defenses of laches and acquiescence are therefore stricken.

### III. CONCLUSION

For the foregoing reasons, Comcast's Motion for Summary Judgment is GRANTED with respect to Fancaster's claims for Federal Trademark Infringement, Corrective Advertising, Federal False Designation of Origin/Unfair Competition, Federal Trade name Infringement, Misappropriation of Trademark & Tradename, Unfair Competition and Deceptive Trade Practices, Trade Name Infringement, and Unjust Enrichment, and DENIED with respect to Fancaster's claim for Cyber Piracy. Counts One, Two, Three, Five, Six, Seven, and Eight of Fancaster's Amended and Supplemental Complaints are dismissed with prejudice.

Fancaster's and Mr. Krueger's Motion for Summary Judgment is GRANTED with respect to Comcast's claims for Fraud on the PTO and Declaratory Judgment of Non-Use, and DENIED with respect to Comcast's claim for Cyber Piracy. Counts One and Two of Comcast's First Amended and Supplemental Counterclaim against Fancaster, Inc. and First Amended and Supplemental Third Party Complaint against Craig Krueger are dismissed with prejudice.

Fancaster's Motion in Limine to Exclude the Surveys and Testimony of Hal Poret is GRANTED with respect to the March 2009 survey and testimony related thereto, and DENIED with respect to the March 2011 Survey and testimony related thereto.

Fancaster's Motion in Limine to Exclude the Testimony of Gary Krugman and Greg Lastowka is GRANTED, except that Mr. Krugman may testify about the subject matter of Paragraphs 1-17 and 20-26 of his November 18, 2009 Report and Mr. Lastowka may testify about the subject matter of Paragraphs 1-4, 6-8, 11-14 and 17 of his Report.

Fancaster's Motion to Strike Comcast's affirmative defenses of fraud, unclean hands,

laches, and acquiescence is GRANTED.  Those defenses are STRICKEN.

The Court will enter an order implementing this opinion.


  _/s/ Dickinson R. Debevoise_____
  DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: December 22, 2011