**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

FANCASTER, INC.,

                  Plaintiff,

v.

COMCAST CORPORATION, COMCAST
INTERACTIVE MEDIA, LLC, and
COMCAST MANAGEMENT, LLC,

       Defendants/Counterclaimants/Third
       Party Plaintiffs

v.

FANCASTER, INC. sometimes d/b/a
"TARGET WIRELESS

       Counterclaim-Defendant,

and CRAIG KRUEGER,

       Third-Party Defendant.

Civ. No. 08-2922 (DRD)

**O P I N I O N**

*Appearances by:*

PASHMAN STEIN PC
by: Michael S. Stein, Esq.
    Sean Mack, Esq.
21 Main Street, Suite 100
Hackensack, New Jersey 07601

MATORIN LAW OFFICE, LLC
by: Mitchell J. Matorin, Esq.
200 Highland Avenue, Suite 306
Needham, Massachusetts 02494

FOLEY HOAG LLP
by: Michael P. Boudett, Esq.
155 Seaport Boulevard
Boston, Massachusetts 02110

    *Attorneys for Plaintiff,*

LOEB & LOEB LLP
by: Jodi Sarowitz, Esq.
   Douglas N. Masters, Esq.
   Tal E. Dickstein, Esq.
345 Park Avenue
New York, New York 10154

    *Attorneys for Defendants.*

## DEBEVOISE, Senior District Judge

      This matter arises out of the residual claims of a lawsuit between two companies that offer online video content via their respective websites.  On December 22, 2011, the Court issued an Opinion and Order dismissing, among other things, Plaintiff Fancaster, Inc.'s ("Fancaster") claims of trademark infringement against Defendants Comcast Corporation, Comcast Interactive Media, LLC, and Comcast Management, LLC's (collectively referred to as "Comcast").  The parties now seek to dispose of the remaining claims in this case.  Specifically, Fancaster filed a Motion to Dismiss Comcast's claim for cyber piracy under the Anticybersquatting Consumer Protection Act ("ACPA") for lack of standing.  In addition, Comcast filed a Motion for Summary Judgment against Fancaster's cyber piracy claim under the ACPA.  Finally, the parties submitted briefs disputing whether Fancaster is entitled to a jury trial on Comcast's cyber piracy claim.

For the reasons set forth below, (1) Fancaster's Motion to Dismiss is GRANTED with respect to Comcast's standing to seek actual damages or injunctive relief but DENIED as to Comcast's ability to seek statutory damages under the ACPA; (2) Comcast's Motion for Summary Judgment is GRANTED; and (3) Fancaster is entitled to a jury trial on Comcast's cyber piracy claim.

## I.     BACKGROUND

The facts of this case are fully set forth in Fancaster, Inc. v. Comcast Corp., No. 08-2922 2011 WL 6426292 (D.N.J. Dec. 22, 2011).  Thus, for the sake of brevity, the Court will repeat only those facts that are necessary to the disposition of the current motions pending in this case.

**A.     The Fancaster Mark and Fancaster.com**

On June 13, 1989, Fancaster's president and sole director, Craig Krueger, registered the term FANCASTER with the United States Patent and Trademark Office ("PTO") for use as a trademark in connection with "broadcasting services."  (Dickstein Decl. [ECF No. 130], Ex. 11.) On September 8, 1994, Mr. Krueger filed a Combined Affidavit of Use and Incontestability for the FANCASTER mark with the PTO.  On July 22, 2006, Fancaster launched its website, facaster.com.  Fancaster.com offers a wide variety of short video clips, most of which feature sports-related content and a sports fan or athlete speaking into a microphone displaying the fancaster[1] mark to discuss a particular sporting event, sports team, or sports fans in general.

**B.     Comcast's "The Fan"**

Comcast, the well-known cable and broadband provider, offers television programming and movie channels to millions of customers across the United States.  In 2003, Comcast began developing a means to deliver this content over the Internet.  On November 20, 2003, Comcast

---

[1] The Court will refer to the fancaster mark in lowercase letters because that is how the mark appears on fancaster.com.

launched a multi-media player on its website, Comcast.net, that allowed users to watch cable television programming online.  That player was called "The Fan" because it displayed available video content in a circular pattern that resembled a fan.

## C.   Comcast's FANCAST[2]

Comcast later sought to develop a stand-alone version of "The Fan" that would be available on a separate website.  During the winter of 2006, Comcast paid an independent branding agency to conduct research and testing of possible names for this new media player. The agency was of the understanding, among other things, that (1) "[t]he name should help communicate that Website X is the ultimate interactive destination for TV and Movie fans," and (2) "the name should somehow tie back to Comcast, [but] the name Comcast should not be used."  (Young Decl. [ECF No. 131], Ex. 1.)  Using these criteria, the agency generated twenty-three potential names.

During the spring and summer of 2006, Comcast hired another branding agency to devise potential names under similar criteria.  On June 23, 2006, the branding agency proposed the name "FanCast.com," in addition to five other names.  (Id., Ex. 4.)  Shortly thereafter, the agency conducted consumer research, which indicated that "Fancast.com" performed the best overall.  In addition, two members of the team at Comcast in charge of choosing a name for the new website testified that the FANCAST name was a logical joinder of "The Fan" and the Comcast name. See (Dickstein Decl. [ECF No. 130], Ex. 3, 4.)  Consequently, Comcast decided to use the FANCAST name and began developing its website.

Comcast purchased the fancast.com domain name and filed an application with the PTO to conduct business using the FANCAST mark in August of 2006.[3]  (Perry Cert., [ECF No. 138]

---

[2] The Court will refer to the FANCAST mark in uppercase letters because that is how the appeared on fancast.com.

Ex. 68); (Sarowitz Decl. [ECF No. 151], Ex. 9.)  It purchased the domain name through the

Corporation Service Company, a well known registered agent service company.  Curiously, in

September 2006, Fancaster began registering large numbers of "fancast" domains.[4]  (Perry Cert.

[ECF No. 138], Ex. 70.)

   *i.*   ***Comcast's Meeting with Mr. Krueger***

   On July 13, 2006, Mr. Krueger met with Comcast employees to pitch a program of his

called Mobile Voter.  At that meeting, he also pitched fancaster's services and website, which he

advised was about to be launched.

   *ii.*   ***Comcast Launches Fancast.com***

   In January 2008, Comcast launched a fully operational version of the FANCAST website

that allowed users to watch full-length, premium mainstream television shows and movies over

the Internet.  Comcast marketed FANCAST to a national audience that consumes mainstream

media.  (Young Decl. [ECF No. 131] ¶ 4.)  Comcast bought advertisements in various

mainstream print publications, including The New York Times, LA Times, USA Today,

Entertainment Weekly, and on television channels distributed via Comcast's cable television

service.  Comcast also bought banner ads on Comcast.net and other websites focused on popular

TV and movies, such as TVGuide.com.  In addition, Comcast purchased ads on internet search

---

[3] Fancaster opposed the application, which remains in stasis pending resolution of this litigation.

[4] These websites include: fancast.co.uk, fancast.org, fancast.us, fancast.eu, fancast.bz, fancast.cc, fancast.gs, fancast.ms, fancast.name, fancast.tc, fancast.tw, fancast.vg, fancast.ws, fancast.au, fancast.com.au, fancast.mobi, fancast.net.au, fancast.nz, fancast.jp, fancast.la, fancast.br.com, fancast.kr.com, fancast.qc.com, fancast.za.com, fancast.es, fancast.eu.com, fancst.gb.com, fancast.uk.com, fancast.us.com, fancast.am, fancastfm, facast.pro, fancast.tel, fancast.cm, fancast.me, and fancast.co.nz.  Fancaster continued to register "fancast" domains into 2010.

engines that would appear when users searched for keywords related to the names of specific television shows available on fancast.com, or terms such as "watch TV shows online."  (<u>Id.</u> ¶ 4.)

      ***iii.    Comcast Dismantles Fancast.com and Starts XfinityTV.com***

By late 2009, Comcast had lost roughly $80 million on the FANCAST website, which relied entirely on advertising revenue.  According to Comcast, this was due to "the unexpectedly high cost of distributing video content on the internet."  (<u>Id.</u>)  Therefore, Comcast began to phase out the FANCAST service by offering a website branded "FANCAST Xfinity TV", which was functionally identical to the existing FANCAST website, but allowed Comcast cable subscribers to access certain premium cable television content through a service called Xfinity TV.  By the end of March 2011, Comcast took down the FANCAST website entirely and instead offered the Xfinity TV service exclusively to subscribers.  All web traffic to www.fancast.com was redirected to www.Xfinitytv.com.  Currently, the FANCAST website states that "www.fancast.com no longer exists.  To watch TV shows & movies online please visit xfinityTV.com."

**D.    The Instant Lawsuit**

On June 12, 2008, Fanscaster filed a Complaint against Comcast, asserting claims for trademark infringement, 15 U.S.C. § 1114(1), false designation of origin, unfair competition, and trade name infringement, 15 U.S.C. §§ 1125(a), 1117(a), cyber piracy, 15 U.S.C. § 1125(d), under the Lanham Act, and trademark misappropriation, unfair competition, and deceptive practices under N.J.S.A. 56:4-1 and New Jersey common law, and seeking treble damages, attorney's fees, and injunctive relief.  In the Complaint, Fancaster demanded a "trial by jury on all issues triable of right by jury."

On June 24, 2008, Fancaster filed an Amended Complaint to add claims for unjust enrichment and trade name infringement under New Jersey law and reiterated its general jury demand.  On September 18, 2008, Comcast answered and asserted counterclaims against Fancaster and claims via a Third-Party Complaint against Fancaster's President, Craig Krueger, for fraud on the PTO, 15 U.S.C. § 1120, and cyber piracy, 15 U.S.C. § 1125(d), and seeking damages, lost profits, attorney's fees, declaratory judgment that the fancaster mark was (1) abandoned; (2) not used in commerce; and (3) obtained and/or maintained by fraud, 15 U.S.C. §§ 1064, 1119, and injunctive relief.  On November 1, 2010, Fancaster filed a Supplemental Complaint setting forth allegations of continued infringement and reiterating its general jury demand for a third time.

On April 29, 2011, Comcast filed a Motion for Summary Judgment on all of Fancaster's claims, pursuant to Federal Rule of Civil Procedure 56(a).  That same day, Fancaster and Mr. Krueger filed a Motion for Summary Judgment on Comcast's counterclaims and third-party claims, pursuant to Federal Rule of Civil Procedure 56(a).

On December 22, 2011, the Court issued an opinion and order granting Comcast's Motion for Summary Judgment against Fancaster's claims for federal trademark infringement, corrective advertising, federal false designation of origin/unfair competition, misappropriation of trademark & tradename, unfair competition and deceptive trade practices, trade name infringement, and unjust enrichment.  In doing so, the Court found that there was no likelihood of reverse confusion between the fancaster and FANCAST marks.  However, the Court denied Comcast's motion with respect to Fancaster's cyber piracy claim because Comcast failed to address that claim in its opening brief.

In addition the Court granted Fancaster's Motion for Summary Judgment against Comcast's claims for fraud on the PTO and declaratory judgment of cancellation, but denied the motion with respect to Comcast's claim for cyber piracy.

## II.  DISCUSSION

Fancaster now moves to dismiss Comcast's Claim for cyber piracy for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(h)(3).  In doing so, Fancaster argues that Comcast abandoned FANCAST as a trademark and therefore no longer has standing to enforce its rights regarding that mark.

In addition, Comcast moves for Summary Judgment against Fancaster's claim for cyber piracy.  In doing so, it argues that (1) there is no evidence of Comcast's bad faith intent to profit from the fancaster mark; and (2) fancast.com is not confusingly similar to the fancaster mark.

Finally, the parties dispute whether Fancaster is entitled to a jury trial on Comcast's cyber piracy claim.  In doing so, Comcast argues that Fancaster waived its right to a jury trial by failing to demand a jury trial specifically with respect to Comcast's cyber piracy claim.  Fancaster, on the other hand, argues that (1) Comcast is estopped from requesting a bench trial because it made references to a future jury regarding its cyber piracy claim in prior briefing; (2) Cyber piracy claims are legal in nature and therefore triable to a jury; and (3) its general jury demand in the initial Complaint preserves its right to a jury trial on Comcast's cyber piracy claim.

## A.    Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For

a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.     The Cyber Piracy Claims**

Cyber piracy, frequently known as "cybersquatting," is "a relatively new addition to the Lanham Act" that "prohibits registering a domain name that is confusingly similar to a distinctive mark or dilutive of a famous mark with 'a bad faith intent to profit' from it."

9

Green v. Fornario, 486 F.3d 100, 105 (3d Cir. 2007).[5]  The prohibition was added to prevent

unscrupulous parties from registering domain names that were similar to protected marks in the

hope of siphoning off related business or extracting a financial payout from the mark's owner.

      ***i.***        ***Comcast's Standing to Bring its Cyber Piracy Claim***

      Standing is a jurisdictional prerequisite under Article III of the United States

Constitution.  "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not

questions and issues but 'Cases' or 'Controversies.'"  Arizona Christian Sch. Tuition Org. v.

Winn, 131 S.Ct. 1436, 1441 (2011).  "To state a case or controversy under Article III, a plaintiff

must establish standing."  Id. at 1442 (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).  The

Supreme Court explained the elements of standing in Lujan v. Defenders of Wildlife, 504 U.S.

555, 560-61 (1992):

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,
> not "conjectural" or "hypothetical." ' Second, there must be a causal connection between
> the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the
> challenged action of the defendant, and not ... th[e] result [of] the independent action of
> some third party not before the court.' Third, it must be 'likely,' as opposed to merely
> 'speculative,' that the injury will be 'redressed by a favorable decision.'"

Further, a plaintiff must have standing at all stages of litigation.  Steffel v. Thompson, 415 U.S.

452, 460 n. 10 (1974).  "Thus, if developments occurring during the course of adjudication

eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss

the case as moot."  Rosetti v. Shalala, 12 F.3d 1216, 1224 (3d Cir. 1993).

      In addition to the requirements to establish constitutional standing, "federal courts have

developed prudential standing concerns," including that "(1) a litigant assert his [or her] own

legal interests rather than those of third parties, (2) courts refrain from adjudicating abstract

---

[5] Prohibitions against cybersquatting were added to the Lanham Act by the
Anticybersquatting Consumer Protection Act ("ACPA") Pub. L. No. 106–113, 113 Stat. 1501
(1999).

questions of wide public significance which amount to generalized grievances, and (3) a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based." Davis by Davis v. Philadelphia Housing Authority, 121 F.3d 92, 96 (3d Cir. 1997) (quotation and citations omitted).

Fancaster argues that Comcast's dismantling of fancast.com and rebranding of the FANCAST mark to Xfinity TV amounts to abandonment of the FANCAST mark, which deprives Comcast of standing to pursue its cyber piracy claims. Fancaster further argues that this renders Comcast's interests outside the zone of interests intended to be protected by ACPA because ACPA requires that a plaintiff be "the owner of a mark that is either distinctive or famous." (Pl. Br. 5.) Comcast argues that (1) it need only allege that it suffered a concrete injury in order to satisfy the injury in fact element of standing; (2) actual or statutory damages will redress past injury; (3) injunctive relief is necessary to protect against Fancaster's current and future cyber piracy; and (4) it is protecting its own interests from cyber piracy and therefore has prudential standing.

A motion to dismiss for lack of subject matter jurisdiction may be considered at any time during the course of litigation. Fed. R. Civ. P. 12(h)(3). Depending on the stage of litigation, a party may raise "a facial or factual challenge to the court's subject matter jurisdiction." Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge requires that the Court "only consider the allegations of the complaint and documents references therein and attached thereto, in the light most favorable to the plaintiff." Id. (citations omitted). In contrast, a factual challenge allows the court to consider evidence outside the pleadings. Id. (citations omitted).

Fancaster clearly sets forth a factual challenge to Comcast's standing to pursue its cyber piracy claims under the ACPA.  In doing so, Fancaster points to the fact that (1) Comcast failed to set forth its computation of actual damages in its Rule 26 disclosures, or supplement those disclosures with such a computation, thereby barring Comcast from presenting evidence of actual damages at trial; and (2) Comcast abandoned FANCAST as a trademark, which eliminates statutory standing to sue under the ACPA.

Thus, Comcast's bare allegation of actual damages resulting from Fancaster's cyber piracy cannot satisfy the injury in fact element of standing at this stage of litigation.  And while Comcast fails to present any evidence of actual damages, it nonetheless maintains standing to sue for statutory damages under ACPA to redress past injuries.[6]  See 15 U.S.C. § 1117(d).

Fancaster's contention that Comcast abandoned the FANCAST mark does not change this result.  While the record indicates abandonment in that Comcast dismantled www.fancast.com and announced that it had ceased use of the FANCAST mark, see 15 U.S.C. § 1127 (A mark is abandoned "[w]hen it use has been discontinued with intent to not resume such use.  Intent not to resume may be inferred from circumstances"), Mr. Krueger's purchase of the pirated "fancast" domain names occurred while Comcast was using and marketing the FANCAST mark.  On the other hand, such evidence of abandonment deprives Comcast of standing to seek injunctive relief under the APCA because there is no indication that the pirated

---

[6] Fancaster contends that the ACPA's statutory damages provision does not serve to relieve a plaintiff from presenting evidence of actual damages to redress an injury in fact for standing purposes and instead is merely an alternative means of quantifying those damages. However, the general policy behind statutory damages provisions suggests quite the opposite. See See Douglas v. Cunningham, 294 U.S. 207, 209 (1935) (The statutory damages provision under the Copyright Act of 1909 "give[s] the owner of a Copyright some recompense for injury due to him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits."); Perrone v. Gen. Motors Acceptance Corp., 232 F.3d 433, 436 (5th Cir. 2000) ("[S]tatutory damages . . . are reserved for cases in which the damages caused by a violation are small or difficult to ascertain.").

"fancast" domains will cause future injury.  See Roe v. Operation Rescue, 919 F.2d 857, 864 (3d Cir. 1990) ("To establish a present case or controversy in an action for injunctive relief, a plaintiff must show that he or she is likely to suffer future injury from defendant's threatened illegal conduct.").  Consequently, Comcast has standing to pursue its cyber piracy claims for statutory damages, but not for actual damages or injunctive relief.

      *ii.*    *Fancaster's Cyber Piracy Claim*

To prevail on a cyber piracy claim, a plaintiff must prove that "(1) [its] is a distinctive or famous mark entitled to protection; (2) [the defendant's] domain names are 'identical or confusingly similar to' [the plaintiff's] mark; and (3) [the defendant] registered the domain names with the bad faith intent to profit from them."  Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).

Comcast sets forth two arguments in support of its motion for summary judgment against Fancaster's cyber piracy claim.  First, Comcast argues that there is no evidence that Comcast had a bad faith intent to profit from the fancaster mark.  Second, Comcast argues that fancast.com is not confusingly similar to the fancaster mark.  The Court need only address the first argument.

15 U.S.C. § 1125(d) provides nine non-exclusive factors to guide the Court in determining whether the bad faith intent to profit element of a cyber piracy claim has been satisfied.  These factors include:

    (I)      the trademark or other intellectual property rights of the person, if any, in the domain name;

    (II)     the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

    (III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)    the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)    the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15  U.S.C. § 1125(d)(1)(B)(i)

As discussed below, each of these factors weighs against a finding of bad faith intent to profit from the fancaster mark on the part of Comcast, thereby meriting summary judgment against Fancaster's cyber piracy claim.

1.    <u>The trademark or other intellectual property rights of the person, if any, in the domain name</u>

The record indicates that Comcast chose the www.fancast.com domain name as the homepage for the FANCAST mark, which was a combination of Comcast's "The Fan" online video player and the well-known Comcast name.  In addition, Comcast used the domain name to

offer full-length, mainstream television shows and movies, while the fancaster mark was used in conjunction with short, sports-related video clips.  See 4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.) ("This factor takes account of the fact that the same or similar marks can peacefully coexist in the marketplace without a likelihood of confusion when used in widely differing product or service lines or in remote geographic markets.").  Thus, the first factor weights against a finding of bad faith.

        2.      <u>The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person</u>

While the name FANCAST does not fully encompass the Comcast name, as discussed above, it incorporates half of the Comcast name and its former proprietary online video player, "The Fan".  Thus, the second factor weighs against a finding of bad faith.

        3.      <u>The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services</u>

This factor weighs in favor of good faith if the defendant can show that it used the domain name in connection with goods and services before the dispute arose.  See 4 McCarthy § 25:78.  It is undisputed that Comcast used the FANCAST domain name in connection with offering mainstream television and video content several months before Fancaster asserted its cyber piracy claim.  Accordingly, the third factor weighs against a finding of bad faith.

        4.      <u>The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name</u>

This factor "is intended to balance the interests of trademark owners with the interests of those who would make lawful noncommercial or fair uses of others' marks online, such as in comparative advertising, comment, criticism, parody, news reporting, etc." H.R. Rep. No. 106-412 p. 11 (October 25, 1999).  Comcast did not make any noncommercial or fair use of the

FANCAST domain name, which renders this factor inapplicable.[7]  See Southern Grouts &

Mortargs, Inc. v. 3M Co., 575 F.3d 1235, 1249 (11th Cir. 2009) (Fourth factor found

"inapplicable because that factor concerns domain names used for 'comparative advertising,

criticism, comment, or parody' and the [defendant's] domain name [was] not used for any of

those purposes.").

> 5.   The person's intent to divert consumers from the mark owner's online
>       location to a site accessible under the domain name that could harm the
>       goodwill represented by the mark, either for commercial gain or with the
>       intent to tarnish or disparage the mark, by creating a likelihood of
>       confusion as to the source, sponsorship, affiliation, or endorsement of the
>       site

There is no evidence from which a jury could infer any intent on the part of Comcast to

divert consumers away from fancaster.com for any purpose.  Fancaster contends that there is a

factual dispute as to whether Comcast employees—as opposed to the branding agency hired by

Comcast—first suggested the name FANCAST as a result of hearing about fancaster.com from

Mr. Krueger at his July 13, 2006 meeting with Comcast employees.  However, there is no such

dispute because the record is clear that the branding agency hired by Comcast first proposed the

name "FanCast" on June 23, 2006.  Moreover, even if there were such a dispute, it would not be

material because Comcast's mere knowledge of fancaster.com before devising the FANCAST

mark does not serve to create a reasonable inference that it intended to divert customers away

from fancaster.com.  See Cline v. 1-888-PLUMBING Grp., Inc., 146 F. Supp. 2d 351, 372

(S.D.N.Y. 2001) ("Prior knowledge does not necessarily give rise to an inference of bad faith

---

[7] Fancaster contends that Comcast's failure to make noncommercial or fair use of the
FANCAST domain name weighs in favor of finding bad faith, despite its making a bona fide
commercial use of the domain name.  This cannot be so.  The ACPA's statutory scheme suggests
that either a bona fide commercial use of a domain name or a bona fide noncommercial or fair
use of a domain name can weigh against a finding of bad faith in a defendant's use of the domain
name.  To require both would be illogical.

because adoption of a trademark with actual knowledge of another's prior registration may be consistent with good faith."). Thus, the fifth factor weighs against a finding of bad faith.

      6.    <u>The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct</u>

There is no evidence that Comcast made any attempt, or even intended, to transfer, sell, or otherwise assign the FANCAST domain name to a third party for any reason. Moreover, as previously discussed, Comcast offered mainstream television and movie content in conjunction with the FANCAST mark and domain name. Thus, the sixth factor weighs against a finding of bad faith.

      7.    <u>The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct</u>

There is no evidence that Comcast provided material or misleading false contact information when applying for the registration of fancast.com. The fact that Comcast registered the domain through its registered agent in no way suggests an intent to avoid being identified or served with process. <u>See</u> 4 McCarthy § 25:78 ("[T]he provision of false contact information to a registrar is a hallmark of the cybersquatter, who wants to profit without being easily identifiable and served with process."). Consequently, the seventh factor weighs against a finding of bad faith.

      8.    <u>The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties</u>

There is no evidence that Comcast registered or acquired any domain names that are identical or confusingly similar to others' famous or distinctive marks.  Fancaster cites to <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d 774, 786 (8th Cir. 2004) to support the contention that Comcast's registration "of numerous domains that are identical or confusingly similar to the FANCASTER Mark" weighs in favor of a finding of bad faith.  However, in that case, the defendant registered "Internet domain names which incorporated [multiple] distinctive, famous, and protected marks owned by the plaintiffs . . . include[ing] drinkcoke.org, mycoca-cola.com, mymcdonalds.com, mypepsi.org, and my-washingtonpost.com."  <u>Coca-Cola</u>, 382 F.3d at 779.  Indeed, the eighth factor "recognizes as a marker of one type of cybersquatting the warehousing of many domain names . . . consisting of various identical or similar combinations of the marks of others."  4 McCarthy § 25:78.  Here, in contrast, there is no evidence that Comcast registered domain names resembling marks other than fancaster.  Thus, the eighth factor weighs against a finding of bad faith.

         9.    <u>The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section</u>

"This factor simply directs the court's attention to the strength of the plaintiff's mark."  4 McCarthy § 25:78.  In its December 22, 2011 ruling, the Court found the fancaster mark to be descriptive and therefore relatively weak.  See <u>Fancaster</u>, 2011 WL 6426292, at *26-29.  Fancaster argues that this factor weighs in its favor because "[t]he [ACPA] statute requires that the trademark be *either* distinctive *or* famous, but not both (Pl. Br. 19) (emphasis in original), and Fancaster's registration of the fancaster mark renders it distinctive as a matter of law.  While a plaintiff need only own a distinctive *or* famous mark—i.e. one that is entitled to protection—in order to have statutory standing to sue under ACPA, see 15 U.S.C. § 1125(d)(1)(A), that mark

must be distinctive *and* famous in order to help support a finding of the defendant's bad faith intent to profit from it.  See 15 U.S.C. § 1125(d)(1)(B)(i)(IX).  Thus, the ninth factor weighs against a finding of bad faith.

**D.      Judge or Jury Trial on Cyber Piracy Claims**

"The right to a jury trial in a civil case is a fundamental right expressly protected by the Seventh Amendment to the United States Constitution."  Tracinda Corp. v. DaimlerChrystler AG, 502 F.3d 212, 222 (3d Cir. 2007) (citations omitted).  Under Federal Rule of Civil Procedure 38(b), "[o]n any issue triable of right by a jury, a party may demand a jury trial by . . . serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served."   "In its demand, a party may specify the issues that it wishes to have tried by a jury; otherwise, it is considered to have demanded a jury trial on all the issues so triable."  Fed. R. Civ. P. 38(c).  "A party waives a jury trial unless its demand is properly served and filed."  Fed. R. Civ. P. 38(d).  However, "[b]ecause the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver."  Tracinda Corp., 502 F.3d at 222 (quotations and citations omitted).

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."  U.S. Const., Amdt. 7.  "Suits at common law" [] refer "not merely [to] suits, which the *common* law recognized among its old and settled proceedings, but [to] suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."  Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 348 (1998) (quotation omitted) (emphasis in original).  "The Seventh Amendment thus applies not only to common-law causes of action, but also to actions

brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." Id. (quotations and citations omitted).

The Supreme Court has "recognized the general rule that monetary relief is legal . . . and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment. Id. (citations omitted).  Further, while cyber piracy "was not a common-law action in English courts in the eighteenth century . . . [it] is a form of trademark infringement . . . [and] therefore likely analogous to a common-law cause of action." GoPets Lts. V. Hise, 657 F.3d 1024, 1034 (9th Cir. 2011).  Thus, there is little doubt that cyber piracy claims are triable by jury.

Despite Fancaster's Seventh Amendment right to a jury trial on Comcast's cyber piracy claim, and its thrice-made general demand for a "trial by jury in all issues triable of right by jury" in each of its pleadings, Comcast now contends that Fancaster waived its right to a jury trial on Comcast's cyber piracy claim because it never specifically demanded a jury trial on that claim.  There is no basis for this contention, and, as Fancaster points out, all of the authority cited by Comcast in its twenty-one page brief concern instances where (1) "a party attempted to revive a right to a jury trial after a clear waiver"; or (2) "a party failed to make a demand of its own, but instead attempted to rely on a jury demand filed by a different party."  (Pl. Br. 4.)

At oral argument, Comcast dredges up a decision from the District of New Mexico holding that a plaintiff's general jury demand in the initial pleading setting forth a Title VII claim against her employer does not extend to a fee dispute between the plaintiff and her attorney.  See United States v. Board of County Comm'rs of the Country of Dona Ana, N.M., 730 F. Supp. 2d 1327, 1343-44 (D.N.M. 2010).  In doing so, the court noted that the plaintiff's initial pleading

only listed claims against her employer but not her attorney.  See id. at 1344.  Here, Comcast's

cyber piracy claim exists between the same parties as those listed in Fancaster's initial

Complaint.  Thus, Fancaster is entitled to a jury trial on Comcast's cyber piracy claim.

### III.  CONCLUSION

For the foregoing reasons, (1) Fancaster's Motion to Dismiss Comcast's cyber

piracy claim for lack of standing is GRANTED with respect to Comcast's standing to seek actual

damages or injunctive relief but DENIED as to Comcast's ability to seek statutory damages; (2)

Comcast's Motion for Summary Judgment against Fancaster's cyber piracy claim is GRANTED;

and (3) Fancaster is entitled to a jury trial on Comcast's cyber piracy claim.

The Court will enter an order implementing this opinion.

  **/s/ Dickinson R. Debevoise_____**
  DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: March 9, 2012